**MULLER OPTICAL COMPANY and Robert E. Long, Plaintiffs,**

v.

**The EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Defendant.**

**No. 83–2836 H.**

United States District Court, W.D. Tennessee, W.D.

Nov. 10, 1983.

Stephen H. Biller of Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, Tenn., for plaintiffs.

David L. Slate, Michael A. Middleton, Joseph Ray Terry, Daniel A. Williams, of E.E.O.C., Washington, D.C., Lawrence J. Kamenetzky, Zelma Phillips Brown, of E.E.O.C., Memphis, Tenn., for defendant; W. Hickman Ewing, R. Larry Brown, Vivian Donelson, Memphis, Tenn., of counsel.

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

HORTON, District Judge.

Plaintiffs Muller Optical Company and its president, Robert E. Long, seek a temporary restraining order or preliminary injunction prohibiting the defendant, Equal Employment Opportunity Commission (EEOC), from requiring Long to appear at a deposition and produce documents in compliance with a subpoena issued by the EEOC. The Court held a hearing on this matter, and, after a full review of the record and careful consideration of the issues involved, enters this Order DENYING plaintiffs' motion.

This action is the culmination of a controversy that began when plaintiffs' former employee, Vera Marie Adkins, filed a charge with the EEOC contending that Muller had discharged her because of her age and her sex. After Muller resisted the EEOC's several attempts to investigate Adkins' charge, the EEOC issued a subpoena, pursuant to the Age Discrimination in Employment Act, ordering Long to appear at the EEOC's office on October 14, 1983. The subpoena required Long to bring specified records and testify before EEOC personnel. In an effort to avoid complying with this subpoena, the plaintiffs filed this action. The plaintiffs contend the EEOC lacks jurisdiction under the Age Discrimination in Employment Act (ADEA) to investigate Adkins' charge.

PLAINTIFFS' CONTENTIONS:

To understand plaintiffs' contention that the EEOC is without authority to investigate an age discrimination charge, it is necessary to look at the underlying legislation. Under Reorganization Plan No. 1 of 1978, the statutory responsibility for administering and enforcing the Age Discrimination in Employment Act was transferred from the Secretary of Labor to the EEOC effective July 1, 1979. This Reorganization Plan was enacted pursuant to the Reorganization Act of 1977, 5 U.S.C. 901 et seq. Through this Reorganization Act, Congress gave the President of the United States authority to restructure and reorganize the executive branch and its agencies. 5 U.S.C. §§ 901, 903. The President was empowered to prepare reorganization plans and submit such plans to both Houses of Congress. 5 U.S.C. § 903. If during the sixty days after a plan was transmitted to Congress, neither house passed "a resolution stating in substance that the House does not favor the reorganization plan," then the reorganization plan became effective. 5 U.S.C. § 906(a). Thus, the Reorganization Act included a legislative veto provision.

The plaintiffs here contend that the presence of a legislative veto provision in the Reorganization Act that authorized the transfer of responsibility for administering and enforcing the ADEA from the Secretary of Labor to the EEOC renders that transfer void. The plaintiffs base their argument on the recent United States Supreme Court decision *Immigration and Naturalization Service v. Chadha,* — U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). In *Chadha* the Supreme Court held unconstitutional a section of the Immigration and Nationality Act authorizing either House of Congress to invalidate the Attorney General's decision to allow a particular deportable alien to remain in the United States. *Id.* at 2788. The Court held in *Chadha* that the House of Representatives' veto of the Attorney General's decision violated the constitutional requirement that legislative acts be passed by *both* Houses

of Congress and presented to the President. Because the one House veto exercised by the House of Representatives failed to comply with these constitutional requirements of bicameralism and presentment, the Court severed the legislative veto provision of the Immigration and Nationality Act and declared the severed provision unconstitutional.

The plaintiffs contend that the presence of the legislative veto within the Reorganization Act serves to invalidate the reorganization plans implemented under the Act. In the plaintiffs' view, there has been no valid statutory grant of authority empowering the EEOC to enforce the ADEA, and therefore, the EEOC has no jurisdiction to subpoena plaintiff Long as a part of an investigation of Adkins' age discrimination charge.

DEFENDANT'S CONTENTIONS:

The EEOC agrees that the Reorganization Act, which authorized the President to transfer the administration of the ADEA from the Secretary of Labor to the EEOC via a reorganization plan, does contain a one House veto provision similar to the one found unconstitutional in *Chadha*. The EEOC, however, advances several arguments to support its contentions that plaintiffs have not established that they are entitled to injunctive relief, nor have they established that the EEOC lacks jurisdiction to investigate Adkins' age discrimination charge. The EEOC's arguments may be summarized as follows:

1. Plaintiffs have not demonstrated that they are entitled to injunctive relief by showing: (a) there is a substantial likelihood they will succeed on the merits; (b) they will suffer irreparable injury absent injunctive relief; (c) granting the injunction would cause no substantial harm to others; and (d) the public interest would be served by issuing injunctive relief.

2. Plaintiffs lack standing to challenge the validity of the legislative veto since plaintiffs have suffered no injury in fact as a result of the presence of the legislative veto in the Reorganization Act.

3. The *Chadha* decision is not applicable here since the transfer from the Secretary of Labor to the EEOC did not involve any unilateral action by only one House of Congress.

4. The *Chadha* decision is not applicable since here the effect of the challenged Reorganization Plan was merely to transfer the enforcement power from one executive agency to another; the transfer determined who enforced the substantive rights created under the ADEA, but it otherwise had no effect on those rights.

5. Congress would have passed the Reorganization Act even if the legislative veto had not been included in the Act. From this, it follows that the unconstitutional one House veto provision is severable from the remainder of the Reorganization Act.

6. In subsequent legislation that does meet the requirements of bicameralism and presentment, Congress has *ratified* the transfer of the administration and enforcement of the ADEA from the Secretary of Labor to the EEOC.

7. Even if *Chadha* does dictate that the Reorganization Act be held unconstitutional and even if Congress has not subsequently ratified the transfer challenged here, the ruling of unconstitutionality should not be applied retroactively.

8. Irreparable harm has not been shown because plaintiffs failed to demonstrate that the EEOC is handling Adkins' age discrimination charge any differently than would the Department of Labor had enforcement not been transferred.

STANDING:

█ The EEOC argues that the plaintiffs lack standing to challenge the EEOC's jurisdiction over age discrimination charges. Article III of the Constitution "requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' *Gladstone, Relators v. Village of Bellwood*, 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] ... (1979), and that the injury 'fairly can be traced to the chal-

lenged action' and 'is likely to be redressed by a favorable decision,' *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] ... (1976)." *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (footnote omitted).

■ The EEOC contends that in order to challenge the legislative veto provision of the Reorganization Act the plaintiffs must demonstrate they have suffered injury *in fact* stemming from the one House veto provision they attack. Since neither the House of Representatives nor the Senate exercised its legislative veto under the Reorganization Act to prevent the ADEA transfer, EEOC contends that the plaintiffs have suffered no injury in fact and therefore have no standing to challenge the EEOC's authority. The Court finds that the EEOC misperceives the nature of the injury in fact sufficient to confer standing. The plaintiffs do not contend that the failure of either House of Congress to exercise the legislative veto caused them injury. Rather, plaintiffs allege their injury arises from the EEOC's issuance of a subpoena that—in plaintiff's view—the EEOC is not constitutionally authorized to issue.

The Court finds that plaintiffs have indeed suffered injury in fact sufficient to confer standing to challenge the defendant's authority to issue the subpoena. Plaintiffs have been subpoenaed to appear with books and records in hand before the EEOC. If plaintiffs comply with the subpoena and the EEOC is without authority to issue the subpoena, then plaintiffs have been subjected to an intrusive and time consuming investigation by a governmental agency acting outside the law. On the other hand, if plaintiffs do not comply with the subpoena, then they may be subjected

to court action initiated by EEOC to enforce compliance with the subpoena. 15 U.S.C. § 49. Failure to obey a court order enforcing the subpoena is punishable as contempt and may also subject these plaintiffs to a fine and/or imprisonment. 15 U.S.C. § 50. This threatened injury also qualifies as injury in fact sufficient to confer standing. If plaintiffs succeed and this action results in a decision favorable to them, their injury can be redressed by an injunction forbidding the defendant from enforcing its subpoena.

APPLICABILITY OF CHADHA:

■ Plaintiffs contend that the Supreme Court's decision in *Chadha, supra,* invalidates the transfer of ADEA administration and enforcement from the Secretary of Labor to the EEOC. This Court is aware that, subsequent to the Supreme Court's ruling in *Chadha,* the constitutionality of provisions containing legislative vetoes is being challenged on many fronts. Because of the newness of the *Chadha* decision, this Court is sailing in largely uncharted seas.[1] Nevertheless, after a careful reading of *Chadha* the Court holds that the Supreme Court's reasoning and holding in *Chadha* do not necessitate a ruling that the EEOC is without authority to investigate an age discrimination charge under the ADEA.

There are significant distinctions between the exercise of the legislative veto held invalid in *Chadha* and the presence of a legislative veto in the Reorganization Act challenged here. *Chadha* dealt with a situation where, through the Immigration and Nationality Act, Congress had delegated to the executive branch (specifically to the Attorney General) "the authority to allow deportable aliens to remain in this country in certain specified circumstances." 103 S.Ct. at 2786, 2770 n. 1. By unilaterally vetoing the Attorney General's decision al-

---

1. The Court is aware of only one published post *Chadha* decision dealing with this issue. In *EEOC v. Allstate Ins. Co.,* 570 F.Supp. 1224 (S.D. Miss.1983), a federal district court found that the presence of a legislative veto in the Reorganization Act of 1977 invalidated the entire Act. That court then held that Reorganization Plan 1 of 1978, implemented under the Act, was ineffective to transfer the power to enforce the Equal Pay Act from the Secretary of Labor to EEOC. That decision, of course, is not binding on this Court. This Court does not concur in that decision.

lowing Mr. Chadha to remain in the United States, the House of Representatives "took action that had the purpose and effect of altering the legal rights, duties and relations of persons, including the Attorney General, Executive Branch officials and Chadha, all outside the legislative branch." 103 S.Ct. at 2784. The Supreme Court stated that once Congress has delegated its authority, Congress must abide by that delegation "until that delegation is legislatively altered or revoked." 103 S.Ct. 2786. Unilateral action by only one House of Congress is constitutionally insufficient to effect such an alteration or revocation.

In contrast, the transfer from the Secretary of Labor to the EEOC of the authority to administer and enforce the ADEA did not involve the exercise of a legislative veto. Either House of Congress could have halted the transfer by vetoing it within sixty days of the President's transmittal of the Reorganization Plan to Congress. However, neither House took any veto action. Furthermore, the legislation involved in the ADEA transfer merely shifted from one administrative body to another the power to enforce legislation that had already been approved by both Houses of Congress and the President. Unlike in *Chadha,* where the House's veto would have resulted in the deportation of Mr. Chadha, Reorganization Plan 1 of 1978 did not affect any substantive rights.

Although the Supreme Court did find the one House veto constitutionally deficient, *Chadha* is not read by this Court to hold that the mere presence of a one House veto provision in a legislative scheme will invalidate the entire legislative scheme. To the contrary, the Supreme Court, in *Chadha,* severed the offensive one House veto provision and left intact the remainder of the Immigration and Nationality Act. 103 S.Ct. at 2774–76, 2788. This Court then must address the issue whether the legisla-

tive veto is severable from the Reorganization Act of 1977.

SEVERABILITY:

■ The plaintiffs here contend that the Reorganization Act's one House veto provision is not severable, and, therefore, the entire Reorganization Act (and all reorganization plans implemented thereunder) must be invalidated. Defendant EEOC maintains that the one House legislative veto is severable from the remainder of the Reorganization Act of 1977 and that the reorganization plans implemented thereunder remain valid.

■ Because the Reorganization Act of 1977 does not contain a severability clause,[2] the Court must try to determine whether Congress would have enacted other portions of the statute in the absence of the invalidated legislative veto provision. *Consumer Energy Council v. Federal Energy Regulatory Commission,* 673 F.2d 425, 442 (D.C.Cir.1982), *aff'd,* —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983). "Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Buckley v. Valeo,* 424 U.S. 1, 109, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (quoting *Champlin Refining Co. v. Corporation Commission,* 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932)).

To determine whether Congress would have enacted the other provisions of the Reorganization Act of 1977 in the absence of the one House veto provision requires an examination of the Act and its legislative history, along with an unavoidable attempt at clairvoyance.

The practice of Congress' delegating to the President the authority to reorganize the executive branch via reorganization plans is not new; the first reorganization act gave this power to President Hoover in

---

**2.** As the Supreme Court stated in *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), "whatever relevance such an explicit [severability] clause might have in creating a presumption of severability, the ultimate determination of severability will rarely turn on the presence or absence of such a clause." 390 U.S. at 585 n. 27, 88 S.Ct. at 1218 n. 27 (citations omitted).

1932. H.R.Rep. No. 95–105, 95th Cong., 1st Sess., reprinted in 1977 U.S.Code Cong. & Ad.News 41, 44 [hereinafter House Report]. Since the first reorganization act, Congress has from time to time renewed or modified the reorganization act to allow the President a specific time period in which to submit reorganization plans. The scope of authority granted the President and the manner by which reorganization plans must be approved has also varied. House Report at 44–46. The initial reorganization act provided for Congressional disapproval of reorganization plans by either House of Congress, and some form of one House veto has been included in most subsequent renewals or extensions of the act.

In ascertaining whether Congress would have enacted the balance of the Reorganization Act of 1977 in the absence of the legislative veto, it is necessary to look at the reasons Congress articulated for adopting the Act. The legislative history of the Act emphasizes that in our rapidly changing society "[f]unctions change, new methods are developed, bureaucratic structures become obsolete, new laws are passed." House Report at 43–44. To adapt to such changes modification of the government's organizational structure is needed. *See* 5 U.S.C. § 901. Congress expected the Reorganization Act to bring about changes in the executive branch that would result in "cost reduction, improved management and better services to the public." House Report at 43.

Rather than employing the normal legislative process, Congress chose to use the legislative veto and thereby delegate the responsibility for such reorganization to the President; such delegation was chosen because it was speedier and more expeditious. House Report at 44; 5 U.S.C. § 901(a)(b). The Act's legislative history clearly shows that in choosing this route Congress was aware of the questionable constitutionality of the legislative veto. House Report at 42–43, 49–57, 63–70. Despite this awareness, Congress did not omit the legislative veto provision but, instead, took several measures to "strengthen the role of Congress and help allay, in part,

those fears of unconstitutionality." House Report at 43.

First, in an effort to lessen objections to the use of the legislative veto, Congress made several modifications in the procedure by which the reorganization plans were to be handled by Congress. To assure that Congress would have an opportunity to vote on every plan, the Act provided that each time a reorganization plan was transmitted to Congress, a resolution stating that the reorganization plan was disapproved was to be introduced in both the House and Senate. 5 U.S.C. §§ 909, 910. The disapproval resolution was then to be referred to designated committees in each House; and the committees were to make their recommendations to their respective House within forty-five days. 5 U.S.C. § 910. If a committee did not report a resolution within the specified time, the committee was deemed discharged from further consideration of the resolution and the resolution was placed on the appropriate calendar of the House involved. 5 U.S.C. § 911. Thereafter, any member of the respective House could move to proceed to reconsideration of the disapproval resolution. 5 U.S.C. § 912. This plan was devised to "virtually guarantee a vote within the 60-day period in all cases and [guarantee] that Congress [would] have the opportunity to consider and act upon reorganization plans in a reasonable and expeditious manner." House Report at 48.

In addition to these procedural safeguards designed to insure a Congressional vote on each plan, Congress also included safeguards in the form of limitations on Presidential authority. Under the Reorganization Act of 1977, the President could not abolish enforcement functions or statutory programs, 5 U.S.C. § 903(a)(2), nor could he abolish independent regulatory agencies or their functions or consolidate two or more such independent regulatory agencies, 5 U.S.C. § 905(a)(1). These limitations had not been present in previous reorganization plans. House Report at 46, 47.

Having established that Congress was well aware that the presence of the legislative veto created "serious constitutional questions," House Report at 42, and that in light of such questions Congress adapted the Reorganization Act to increase Congressional involvement and lessen the authority delegated to the President, the Court is still faced with the problem of whether Congress would have enacted the Act absent the one House veto provision. Some evidence that Congress would not have done so can be found in Congressman Robert Drinan's separate views appended to the Act's legislative history. House Report at 66–70. Congressman Drinan questioned the necessity of bypassing the normal legislative process and risking that the courts would hold the Act unconstitutional. He stated that the Act "intentionally does not contain a severability clause. The one House veto provision is deemed to be an integral and necessary part of the legislative scheme for reorganization. That is a proposition to which all agree." House Report at 69. Despite Congressman Drinan's assertion, there is no evidence in the Act or in the House Report that a severability clause was considered. Instead, the House Report shows that the committee rejected a proposal that would have required the passage of a resolution by both Houses before a reorganization plan could go into effect. Whether a severability clause was even considered is not mentioned in the Committee's Report.

Based on this review of the Reorganization Act of 1977 and its legislative history, the Court cannot say that "it is evident that the legislature would not have enacted" the other provisions of the Reorganization Act independent of the legislative veto provision. *Buckley, supra,* 424 U.S. at 109, 96 S.Ct. at 677. Congress was keenly aware of the need for reorganization of the executive branch and adopted the most expeditious means of accomplishing such a reorganization. Several reorganization plans were implemented under the Reorganization Act of 1977, and these plans made many changes in the organizational structure of the executive branch of government. Nowhere is it evident that Congress would not have enacted the mechanism for reorganization of the executive branch absent the use of the legislative veto provision. Since, absent the one House veto provision, the remainder of the Reorganization Act "is fully operative as a law," the Court finds the invalid legislative veto provision severable and thus, the remainder of the Act valid.

Because of the admitted difficulty in attempting to divine post facto what Congress would have done, the Court is reluctant to base its holding solely on the severability of the one House veto. Consequently, the issue of Congressional ratification will also be addressed.

CONGRESSIONAL RATIFICATION:

■ The defendant EEOC argues that even if Reorganization Plan No. 1 of 1978 lacked the constitutionally required attributes of bicameralism and presentment, subsequent Congressional ratification of the Plan has cured these problems.

■ When the President, by executive order, has taken action that he may not have been authorized to take, Congress, in some situations, has the power to ratify the President's action and thus legitimize any irregularity. *Isbrandtsen-Moller Co. v. United States,* 300 U.S. 139, 57 S.Ct. 407, 81 L.Ed. 562 (1937). Such Congressional ratification may occur when both Houses of Congress either pass legislation appropriating funds to implement the executive order or make reference to the executive order in subsequently passed legislation. *Id.* at 147–48, 57 S.Ct. at 411–12. *See also Fleming v. Mohawk Wrecking & Lumber Co.,* 331 U.S. 111, 118–19, 67 S.Ct. 1129, 1133, 91 L.Ed. 1375 (1947); *Ex parte Mitsuye Endo,* 323 U.S. 283, 303 n. 24, 65 S.Ct. 208, 219 n. 24, 89 L.Ed. 243 (1944); *Swayne & Hoyt v. United States,* 300 U.S. 297, 301–302, 57 S.Ct. 478, 479–480, 81 L.Ed. 659 (1937).

An examination of the *Isbrandtsen-Moller* decision is instructive since the situation there is analogous to the case at bar. There, by executive order, the President

had abolished the Shipping Board and transferred its functions to the Secretary of Commerce. Subsequently, the Secretary of Commerce issued an order requiring the plaintiff shipping company to file certain records with the Secretary; the plaintiff shipping company then brought an action to restrain the enforcement of the Secretary's order. 300 U.S. at 140–44, 57 S.Ct. at 408–10. In challenging the Secretary's authority to issue the order, the shipping company argued that Congress had not intended that the President abolish the Shipping Board and transfer the Board's functions to the Secretary of Commerce, and, thus, the Secretary was without authority to issue the order. The United States Supreme Court held that via subsequent appropriation acts, which made appropriations to the Department of Commerce for salaries and expenses to carry out the provisions of the Shipping Act and made reference to the executive order, "Congress appear[ed] to have recognized the validity of the transfer and ratified the President's action." 300 U.S. at 147, 57 S.Ct. at 411. In addition to finding Congressional ratification in the appropriations acts, the Supreme Court relied on Congressional mention in the Merchant Marine Act of 1936 that the functions formerly performed by the Shipping Board were "now vested in the Department of Commerce pursuant to ... the President's Executive order." 300 U.S. at 148, 57 S.Ct. at 412 (quoting 46 U.S.C.A. § 1114(a)). The Court found that Congress had ratified the action taken by the President in his executive order.

Here the EEOC contends that by subsequent legislative action Congress has ratified the transfer of administering and enforcing the ADEA from the Secretary of Labor to the EEOC. Two recent appropriations acts clearly indicate that money appropriated to the EEOC is to be used to enforce the Age Discrimination in Employment Act, as well as to enforce Title VII. Act of Dec. 21, 1982, Pub.L. No. 97–377, 96 Stat. 1830, 1874 (1982); Act of Dec. 15, 1981, Pub.L. No. 97–92, 95 Stat. 1183, 1192 (1981). Both of these bills were approved by both Houses of Congress and signed by the President. Additionally, Section 905 of the Civil Service Reform Act of 1978, 5 U.S.C. § 1101 notes, provides that any provision of either Reorganization Plan Numbers 1 or 2 of 1978 that is inconsistent with the Civil Service Reform Act of 1978 is thereby superseded. The Civil Service Reform Act of 1978 did not affect Reorganization Plan 1's transfer of ADEA enforcement; therefore, the Court finds that Congress impliedly ratified the portions of the Reorganization Plan that transferred jurisdiction of the ADEA to the EEOC.

The Court is aware that in the same situation another district court did not find Congressional ratification of the Reorganization Act. See supra p. 950 n. 1. There is a line of cases standing for the proposition that when administrative action has raised "serious constitutional problems," specifically procedures of doubtful constitutionality affecting a person's due process rights to confrontation, the Supreme Court will look for "explicit action by lawmakers" and will not infer delegation or ratification without such explicit action. Greene v. McElroy, 360 U.S. 474, 506–08, 79 S.Ct. 1400, 1419–20, 3 L.Ed.2d 1377 (1959). The transfer of administrative functions from one governmental agency to another at issue here, however, does not involve such serious constitutional rights.

Under the reasoning of Isbrandtsen-Moller, the Court finds that through the appropriations acts and the Civil Service Reform Act of 1978, Congress has ratified the transfer of the administration and enforcement of the ADEA from the Secretary of Labor to the EEOC.

CONCLUSION

The Court finds, based on the severability of the one House veto provision from the remainder of the Reorganization Act and upon subsequent Congressional ratification of Reorganization Plan No. 1 of 1978, the Reorganization Plan validly transferred responsibility for the administration and enforcement of the Age Discrimination in Employment Act from the Secretary of La-

bor to the Equal Employment Opportunity Commission. Because of this conclusion, it is obvious that plaintiffs are *not* entitled to injunctive relief. Plaintiffs' ground for relief is based on the allegation that the EEOC lacks jurisdiction to investigate age discrimination charges. Having found that the EEOC does possess such jurisdiction, the Court hereby denies plaintiffs' motion for injunctive relief. Plaintiffs have no probability of success on the merits in this case. The EEOC is therefore authorized to proceed forthwith in its investigation of the charge against Muller Optical Company.