EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

INGERSOLL JOHNSON STEEL COMPANY, Defendant.

No. IP 83–269–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 5, 1984.

**984**

Alice M. Craft, E.E.O.C., Indianapolis, Ind., for plaintiff.

Herbert C. Snyder, Jr., Barnes & Thornburg, Indianapolis, Ind., for defendant.

DILLIN, Chief Judge.

### ENTRY

Defendant's motion for judgment on the pleadings, which we treat as a motion to dismiss, is denied in accordance with the following memorandum.

### *Memorandum*

This is an action to enforce the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, brought by the Equal Employment Opportunity

Commission (EEOC) against Ingersoll Johnson Steel Company. The defendant has moved for judgment on the pleadings, contending that EEOC has no authority to bring this action.

The defendant captions this motion as one seeking judgment on the pleadings, a misnomer. Judgment on the pleadings is judgment on the merits and can be had after the close of pleadings when they disclose no genuine issue of material fact. It has res judicata and collateral estoppel effect. *Flora v. Home Fed. Savings and Loan Ass'n,* 685 F.2d 209 (7th Cir.1982). Here, where defendants have denied material allegations in the complaint (e.g. Answer, ¶¶ 8, 9), they fail to meet the standard for judgment on the pleadings. The defendant in fact seeks a decision that the plaintiff has no authority to sue and thus that this Court has no jurisdiction over the subject matter. We will treat the motion as one to dismiss under Rule 12(b)(1).

The ADEA gave enforcement authority to the Secretary of Labor, 29 U.S.C. § 626. Congress, however, later passed the Reorganization Act of 1977, giving the President limited authority to make certain organizational changes in the executive branch. Under this grant, the President shifted enforcement authority from the Secretary of Labor to EEOC.

The defendant now challenges the allocation of ADEA enforcement power to EEOC. The sole basis for the challenge rests in the Reorganization Act of 1977, Pub.Law 95–17, 91 Stat. 29, 5 U.S.C. § 901 *et seq.* The law gave the President power to draw up reorganization plans which were submitted to Congress and took effect if neither house of Congress passed a resolution precluding their effectiveness within 60 days. This mechanism for Congressional preclusion is commonly known as the legislative veto.

The President's proposal to shift ADEA jurisdiction from Labor to EEOC was part of Reorganization Plan No. 1 of 1978 which consolidated most federal antidiscrimination enforcement in EEOC. This plan was submitted to Congress in accordance with law. Both houses considered resolutions to disapprove the plan. The House voted not to disapprove, 356–39. 124 Cong. Rec. H11330 (April 25, 1978). The Senate voted unanimously not to consider the resolution. 124 Cong.Rec. S12888 (May 8, 1978). Thus, ADEA enforcement authority was transferred to EEOC.

In *Immigration and Naturalization Service v. Chadha,* — U.S. —, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the Supreme Court held that a one-house legislative veto was unconstitutional in the context of a deportation order by the Attorney General. The arrangement violated Article I, Section 7 of the Constitution because it purported to exercise legislative power, but did not involve passage of legislation by both houses and its presentation to the President for signature. *Chadha* was the first case in which the Supreme Court discussed the legislative veto, but the procedure had been held unconstitutional in other contexts by courts of appeals. *See, e.g., Consumers Union v. FTC,* 691 F.2d 575 (D.C.Cir.1982), *aff'd without opinion,* — U.S. —, 103 S.Ct. 3556, 77 L.Ed.2d 1403 (1983); *Consumer Energy Council v. Federal Energy Regulatory Commission,* 673 F.2d 425 (D.C.Cir.1982), *aff'd without opinion,* — U.S. —, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983).

The *Chadha* decision stated that "Not every action taken by either House is subject to the bicameralism and presentment requirements of Art. I. Whether actions taken by either House are, in law and fact, an exercise of legislative power depends not on their form but upon whether they contain matter which is properly to be regarded as legislative in character and effect." 103 S.Ct. at 2784. Any action legislative in character must be performed by passage in both houses and presentment to the President.

The court did not state explicitly that the legislative veto is unconstitutional in every context, although the two justices who wrote separately took the case to stand for that proposition. 103 S.Ct. at 2788 (Powell,

J., concurring). 103 S.Ct. at 2792 (White, J., dissenting). The first commentary on the decision expresses less certainty. *The Supreme Court, 1982 Term*, 97 Harv.L. Rev. 70, 191 (1983) ("the implications of the *Chadha* decision for the veto device itself are unclear.").

The application of *Chadha* to the Reorganization Act's conferral of enforcement powers on the EEOC already has been addressed by at least four federal district courts. In *EEOC v. Allstate Insurance Co.*, 570 F.Supp. 1224 (S.D.Miss.1983), Judge Barbour found that *Chadha* renders unconstitutional the legislative veto in the Reorganization Act because it purports to exercise legislative power without the Article I formalities. The court went on to find that the unconstitutional provision was not severable from the balance of the statute, concluding that "there is no doubt that Congress intended the one-house veto provision to be an integral and inseparable part of the entire Act such that it would limit the power of the President to propose and enact reorganization plans." *Id.* at 1232. The case thus held that the entire Act was unconstitutional, and all of the reorganization plans submitted under the Act were of no force. This broad holding undoes a large part of the federal government, effectively abolishing the Nuclear Regulatory Commission, Office of U.S. Trade Representative, International Communication Agency, Merit Systems Protection Board and Office of Personnel Management, among other agencies.

In *Muller Optical v. EEOC*, 574 F.Supp. 946 (W.D.Tenn.1983), the court did not decide the constitutionality of the legislative veto provision because it found the provision severable from the balance of the Reorganization Act. It also found that subsequent Congressional actions ratified the transfer of ADEA enforcement jurisdiction to EEOC. Thus, the agency was allowed to continue its enforcement action. In *EEOC v. Jackson County, Missouri*, No. 83–1118–CV–W–1 (W.D.Mo. December 13, 1983), the court simply concurred with and incorporated the *Muller Optical* decision, allowing suit by EEOC to proceed.

Also, in *EEOC v. Pan American World Airways*, 576 F.Supp. 1530 (S.D.N.Y.1984) (available on Westlaw), the Court stayed its case without ruling on Pan American's motion to dismiss based on grounds similar to the motion before this Court. The stay awaits appellate review of the *Allstate* decision.

### Constitutionality

The parties before the Court agree that the legislative veto provision in the reorganization statute is unconstitutional. Each side has reason for this position. For the defendant, unconstitutionality is a building block in its defense that EEOC has no prosecutorial authority. For EEOC, as for other executive branch agencies, the legislative veto has long been anathema. The Court is not prepared to declare the legislative veto unconstitutional in this case, especially without an adversarial presentation on the issue.

*Chadha's* method for analyzing the legislative veto question is based entirely on the *exercise* of the legislative power through the veto device. The *Chadha* court held that Congress could not exercise the legislative power without bicameralism and presentment. In this case, however, there is no such exercise, at least as the *Chadha* court defined it. The Reorganization Act left open the possibility that such power would be exercised, because one house could have prevented any reorganization plan from taking effect. But the Supreme Court has not yet spoken on how to evaluate the constitutionality of a scheme in which only a *threat* of legislative veto was present and when, in effect, both houses voted to approve the executive action in question.

Partly because of doubts about the constitutionality of the legislative veto in general, Congress also modified the legislative veto system in the Reorganization Act to make it conform as closely as possible to the constitutional model of presentment and bicameralism. First, the reorganization plans submitted by the President could

not be changed by Congress in any way. Pub.Law 95–17, § 909, 91 Stat. 29 (1977) (not codified). Thus, it is certain that any plan that emerges from the process conforms to the executive's wishes. Sponsors of the plan believed that this device met the objectives of presentment. 123 Cong.Rec. H9349 (March 29, 1977) (statement of Rep. Levitas). 1977 U.S.Code Cong. & Admin. News 41, 50. Second, for the first time, the law was written to require a vote in each house on a disapproval resolution for each reorganization plan. Previously, no vote was mandated and consideration of disapproval resolutions took place only occasionally. Through this device, each house would indeed act on each plan for reorganization, eliminating questions about failure to meet the bicameralism requirement of Article I. 123 Cong.Rec. H9359 (statement of Rep. Drinan). 1977 U.S.Code Cong. & Admin.News 48. *Chadha* leaves unclear whether the special provisions of the Reorganization Act meet the requirements of presentment and bicameralism.

■ The Attorney General of the United States, who first raised questions about the constitutionality of the legislative veto in the 1930's, found that the Reorganization Act passed muster under Article I.' Significantly, this act is the only statute containing a legislative veto which any Attorney General ever opined was constitutional. 1977 U.S.Code Cong. & Admin.News, 50–51.

> Congressional action outside the check of the presidential veto should be constitutionally suspect as it carries the potential for shifting the balance of power to Congress and thus permitting the legislative branch to dominate the executive. If a statute authorizing control by Congress over executive action by later resolution has the effect of evading the constitutional safeguards of concurrence of both Houses and the presidential veto, then it violates Article I, § 7 of the Constitution.

> \*    \*    \*    \*    \*    \*

I am of the opinion that the procedure provided in the reorganization statute for congressional disapproval of a reorganization plan submitted by the president satisfies this test and, therefore, is constitutional.

> Under the reorganization statute procedure the two Houses of Congress and the President possess the same relative power as under the normal Article I legislative process.

Senate Report No. 95–32, App. II. Some scholars also testified before Congressional committees that the proposal was unconstitutional. 1977 U.S.Code Cong. & Admin. News, 51–54 (Prof., now Judge, Scalia and Prof. Kurland) (these comments were based on a different version than ultimately was enacted). Because of these special procedures in the act, because the legislative veto was not exercised in this case, and because there is before us no adversary presentation on the issue of constitutionality, we reserve any holding on the constitutionality of the provision as it applies to this case.

### *Severability*

■ We are still, however, able to rule on the defendant's motion because we find the legislative veto provision severable from the balance of the Reorganization Act. Whether or not it is constitutional, the delegation of authority under which EEOC received its enforcement authority is valid. In addressing the issue of severability, "the crucial inquiry [is] whether Congress would have enacted other portions of the statute in the absence of the invalidated provision." *Consumer Energy Council v. FERC*, 673 F.2d 425 (D.C.Cir.1982), *aff'd without opinion*, — U.S. —, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983). " 'Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as law.' *Champlin Refining Co. v. Corporation Comm'n*, 286 U.S. 210, 234, 52 S.Ct. 559 [564], 565, 76 L.Ed. 1062 (1932)." *Buckley v. Valeo*, 424 U.S. 1, 108–109, 96 S.Ct. 612, 677–678, 46 L.Ed.2d 659 (1976).

The *Chadha* court also addressed the issue of severability. The court traced the history of immigration legislation, revealing that growing Congressional irritation over private immigration bills led Congress to insert the legislative veto to minimize the time and attention it had to give to the subject. The court wrote that "A provision is further *presumed* to be severable if what remains after severance 'is fully operative as a law.'" — U.S. at —, 103 S.Ct. at 2775, 77 L.Ed.2d at 334 (emphasis added) (citation omitted). In *Chadha*, because Congress's delegation of certain powers regarding immigration were fully operative even when the supervisory authority of the legislative veto was withdrawn, and because Congress expressed an intention not to legislate on this topic but rather to delegate its power, the veto provision was found severable. "Although it may be that Congress was reluctant to delegate final authority ... such reluctance is not sufficient to overcome the presumption of severability ...." at —, 103 S.Ct. at 2774, 77 L.Ed.2d at 333.

To analyze the severability question, we must look at Congressional intent as revealed by legislative history. Legislative history is clearly a blunt instrument with which to perform this operation. A statement by a single member of Congress does not necessarily convey the feelings of anyone other than the speaker, some remarks reported in the Congressional Record are added later and not actually spoken in debate, and not every member reads the committee reports before voting. But the reports and debate are the only sources from which intent may be extracted.

Congress had given the President reorganizational authority several times in the past, always for limited periods of time. Originally, there was no legislative veto, but after 1949 the veto was incorporated. Much like the situation in *Chadha* with regard to immigration, members of Congress apparently felt that detailed consideration of reorganization plans as regular legislation would be ineffective and inefficient.

The statute itself lists among its purposes efficiency, economy, and coordination and declares that "Congress declares that the public interest demands the carrying out of the[se] purposes ... and that the purposes may be accomplished in great measure by proceeding under this chapter, and can be accomplished more speedily thereby than by enactment of specific legislation." 5 U.S.C. § 901(b). The House committee report reiterates the necessity of speed: "The Committee recognizes that a mechanism may be needed which is speedier than the normal legislative process, and has historically supported efforts by the President to make the executive branch more responsive to the needs of the American public." 1977 U.S.Code Cong. & Admin.News, 43–44.

Other portions of the legislative history confirm the Congressional desire to enact reorganizational legislation that did not involve separate statutes for each change:

> If we extended reorganization authority of the President by requiring that each plan be submitted in the traditional form of a legislative proposal, the President could too easily be blocked from accomplishing goals which are essential to more effective efficient, economical and responsible operations of the executive agencies of Government.

123 Cong.Rec. H9345 (March 19, 1977) (remarks of Rep. Fountain). *See also*, 123 Cong.Rec. H9362 (March 29, 1977) (remarks of Rep. Levitas). 123 Cong.Rec. S6145–46 (March 3, 1977) (statement of Sen. Ribicoff). Many other senators and representatives stated in debate that reorganization through legislation was too cumbersome to be practical when compared to delegation of the responsibility to the executive. Nearly every member of Congress who spoke with regard to the bill stated that speedy reorganization was a crucial need.

Furthermore, it was clear to any member of the House who read the committee report or listened to floor debate on the measure that there was a question about the constitutionality of the legislative veto

provision of the Act. The committee report stated that "the one-house legislative veto provisions of the bill raise serious constitutional questions." 1977 U.S.Code Cong. & Admin.News, 42. Some members of the House expressed doubts about its constitutionality in debate and in committee. 123 Cong.Rec. H9350 (statement of Rep. Walker). *Id.* at H9357–58 (statement of Rep. Steiger). *Id.* at H9358 (statement of Rep. Benjamin). 1977 U.S.Code Cong. & Admin. News, 63–70 (additional, supplemental, and dissenting views of Hon. Jack Brooks, Hon. Benjamin S. Rosenthal, Hon. John Conyers, Jr. and Hon. Robert F. Drinan).

On the other hand, the Senate did not evince as much doubt on the constitutional issue. Senator Ribicoff, the chief Senate sponsor, mentioned a constitutional doubt once in debate, but it was not mentioned again. 123 Cong.Rec. S6146 (March 3, 1977).

> The [Senate] committee received some conflicting testimony ... on the constitutionality of the procedures utilized in the reorganization acts since 1949 that permit proposed plans to go into effect unless one House or the other adopts a resolution of disapproval. The committee concludes, however, that the use of this procedure is constitutional in this unique area, where the concerns and prerogatives of the executive and legislative branches overlap to such an extent.

Senate Report 95–32, p. 3 (1977). Constitutionality was not a major issue in the Senate, where the Reorganization Act passed, 94–0.

On the whole, however, the legislative history indicates a strongly felt Congressional desire to implement governmental reorganization in a speedy, practical manner by delegation to the President with the retained legislative veto power. On these facts, it is not "evident that the legislature would not have enacted" the Reorganization Act without the legislative veto. 424 U.S. at 108, 96 S.Ct. at 677. Because the delegation is "fully operative as a law" without the veto and Congress expressed a desire that reorganization not be accomplished by the regular process of legislation, the veto provision is severable. 103 S.Ct. at 2775.

The consideration of severability in *EEOC v. Allstate*, 570 F.Supp. 1224 (S.D. Miss.1983), is flawed because, rather than analyze whether the balance of the statute is "fully operative" without the veto provision as the Supreme Court has directed, the court created a new test: "The essential question ... is whether or not Congress would have delegated such broad authority to the President without reserving for itself the review power which is contained in the one-house veto ...." 570 F.Supp. at 1230. Conflating the issues of severability and delegation confuses the issue and omits to consider that Congress conferred such a power without legislative veto prior to 1949. Also, in *Allstate* the court drew from the lack of a severability clause the inference that severability was not intended when in fact "the ultimate determination of severability will rarely turn on the presence or absence of such a clause." *United States v. Jackson*, 390 U.S. 570, 585 n. 27, 88 S.Ct. 1209, 1218 n. 27, 20 L.Ed.2d 138 (1968). The court used only two selections from the legislative history, both of which tended to show "that Congress wishes to retain control over the President's activities" in reorganization. 570 F.Supp. at 1232. The court used these selections to conclude that Congress would not have passed the statute without the veto provision. It did not refer to the many other limits placed on the President's power by the legislation, to the comments about the importance of reorganization made by nearly every speaker, to the fact that one house passed the legislation knowing that it had a potential constitutional defect that could render the veto provision invalid. Based upon the greater weight of the evidence, we conclude that the legislative veto, if unconstitutional, is severable from the balance of the Reorganization Act.

### Delegation

Before proceeding, the Court must analyze whether the authority given the Presi-

dent under the Act oversteps Congress's power to delegate the legislative power. "The *Chadha* decision leaves a number of matters open to speculation. First, the majority's choice of an approach that is logically dependent on a distinction between rulemaking and lawmaking may presage an attempt by the Court to resuscitate the nondelegation doctrine and apply it more vigorously in future cases. Specifically, the Court may now require Congress to prescribe more exacting standards for guiding the exercise of authority delegated to the President and federal agencies." *The Supreme Court, 1982 Term*, 97 Harv. L.Rev. at 191 (1983). Professors Kurland and Tribe, testifying before Congress about the Reorganization Act, separately expressed doubts about the constitutionality of delegating such broad powers to the executive. Tribe noted that the original bill "delegates excessively broad and open-ended legislative authority to the President, in derogation of the Constitution's express command in Article I, section 1 ...." He opined that the bill would have to be "very substantially narrowed" by restrictions on the President's powers to meet the Article I test. 1977 U.S.Code Cong. & Admin.News, 55. In fact, nearly all of Tribe's narrowing suggestions were incorporated, so that the statute as enacted proscribed Presidential changes in the substantive law to the maximum feasible extent. The law now forbids the President from abolishing any enforcement function, conferring any power not expressly authorized by statute, interfering with an independent regulatory agency, abolishing any program created by statute, or creating any new cabinet-level department. 5 U.S.C. §§ 903(a)(2), 905(a)(1).

As Senator Ribicoff stated in the debate on the legislation, "Without the provision defining the scope of the President's power to abolish a function through the plan, the act would have the effect of authorizing plans which do not reorganize, but rather abolish outright services, [sic] the Government must provide to the public .... Authorizing the use of reorganization plans to abolish these programs mandated by statute would be inconsistent with the intent of the act to give the President the ability to reorganize the means by which the executive branch administers the law, not the substantive content of the programs it administers." 123 Cong.Rec. S6144 (March 3, 1977). The bill was amended in the Senate to add further restrictions to the President's power. *Id.* at S6149.

■ The power with which the President is left after this delegation is essentially organizational. He cannot confer or abolish substantive powers, but can only realign agencies and their powers to promote efficiency, economy and better service. Congress addressed the issue of delegation in a manner that set sufficient restrictions on the delegation of power to the executive. *See, Industrial Union Department, AFL–CIO v. American Petroleum Institute*, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (plurality opinion) (Congressional delegation of rulemaking power read narrowly). We cannot hold the delegation unconstitutional in the face of these limits.*

*Ratification*

■ The EEOC also argues that Congress, by making specific reference to EEOC's power to enforce ADEA in a later appropriation, ratified the reorganization plan. Concurring with and incorporating the reasoning in *Muller Optical v. EEOC*, 574 F.Supp. 946 (1983), we find that ratification took place, constituting an alternative ground for upholding the EEOC's enforcement power. We generally rely on the conclusion in *Muller Optical* that this case is governed by *Isbrandtsen-Moller Co. v. United States*, 300 U.S. 139, 57 S.Ct. 407, 81 L.Ed. 562 (1937). In that case, the President transferred certain functions

---

* As well, the strict limits on the President's reorganizational powers support severability. The Congress relied on these limits, as well as the potential legislative veto, to constrain the President's action, and the limits on delegation would remain to constrain the President even if the veto were struck down.

from one agency to another under congressional delegation and his action was held ratified by later appropriation legislation expressly referring to the transfer. Defendant's assertion that *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), undercuts *Isbrandtsen* is to no avail, as it deals with the much stricter standard for implied repeal rather than the law of ratification.

The Court has concluded that the defendant's motion to dismiss presents no basis for termination of the action. Even if the legislative veto provision of the enabling act is unconstitutional, it is severable from the balance of the statute. Thus, the President had authority to transfer ADEA enforcement authority to EEOC, and that transfer was later ratified by Congressional action.