# Effect of *INS* v. *Chadha* on the Authority of the Secretary of Defense to Reorganize the Department of Defense Under U.S.C. § 125

The Secretary of Defense retains authority under 10 U.S.C. § 125 to effect reorganizations of all functions of the Department of Defense, notwithstanding the Supreme Court's decision in *INS* v. *Chadha* invalidating the legislative veto. An analysis of the legislative history of 10 U.S.C. § 125 with respect to the presumptions in favor of severability indicates that the unconstitutional veto provisions in that statute, which permitted either House of Congress to reject a proposed reorganization involving a "major combatant function" that would "tend to impair the defense of the United States," as determined by its Armed Services Committee, are severable from the delegation of authority to the Secretary. However, the Secretary must continue to report all reorganization plans to Congress and wait thirty days before taking action.

April 26, 1984

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL,
DEPARTMENT OF DEFENSE

This memorandum responds to a request for our interpretation of the statutory authority of the Secretary of Defense (Secretary) to reorganize the Department of Defense, 10 U.S.C. § 125, notwithstanding the Supreme Court's decision in *INS* v. *Chadha*, 462 U.S. 919 (1983). Because the statute provides for a one-house veto, a device held unconstitutional in *Chadha*, we have been asked, specifically, to determine (1) whether the Secretary continues to have the power to reorganize "major combatant functions," after reporting his intentions to Congress; and (2) whether the Secretary may continue to effect a reorganization of responsibilities not involving major combatant functions, after reporting its terms to Congress. Based on the analysis set forth below, we have concluded that the Secretary's statutory authority to effect reorganizations of all functions of the Department of Defense is severable from the unconstitutional veto provision, and therefore remains effective.[1] The Secretary must, however, continue to report all reorganization plans to Congress and wait thirty days before taking action.

---

[1] Our analysis and conclusions relate only to the statutory authority granted to the Secretary in § 125(a). We do not attempt to resolve whether the President could delegate reorganizational authority to the Secretary as a result of his constitutionally committed power as Commander-in-Chief.

# I. The Statute

Section 125, part of the Department of Defense Reorganization Act of 1958,[2] sets out the requirements for transfer, reassignment, consolidation, or abolition (hereinafter collectively referred to as "reorganization") of functions, powers and duties assigned by law to the Department of Defense. Under the statute, the Secretary may propose to reorganize any such functions, but must report the details to the Committees on Armed Services of both the Senate and the House. 10 U.S.C. § 125(a). The reorganization becomes effective following thirty days of continuous session after the report is made unless either committee, before that time, has reported to its respective House a resolution rejecting the plan. A committee may report a resolution to reject the proposal only if the proposal involves reorganization of a "major combatant function," as determined by the committee,[3] and would, in the committee's judgment, "tend to impair the defense of the United States." *Id.* Once a resolution of disapproval is reported by one of the two committees, the affected House has an additional forty days in which to adopt the resolution. If the resolution of disapproval is not adopted, the reorganization goes into effect on the forty-first day following the committee's report.

Three types of reorganizations need not be reported to the committees. The President may make temporary reorganizations during hostilities, for which no report is required. *Id.* § 125(c). Additionally, the Secretary is explicitly authorized to assign or reassign (but not to abolish) responsibility for developing and operating new weapons or weapons systems. If the plan involves substantial reduction or elimination of a major weapons system, however, the proposed action must be reported to Congress. *Id.* No veto mechanism is involved. Finally, the statute excludes from both the reporting requirement and the veto power the transfer of supply or service activities common to more than one military department. *Id.* § 125(d).

In short, all reorganizations, except the three just mentioned, must be reported to the two Armed Services Committees of Congress. Unless the reorganization involves major combatant functions, however, the committees have no authority to recommend, nor the Houses to implement, a veto of the plan.

## II. Constitutionality

In *INS* v. *Chadha,* 462 U.S. 919 (1983), the Supreme Court struck down the one-house veto as an unconstitutional exercise of legislative power. Relying on

---

[2] Ch. 412, 63 Stat. 514 (1958).

[3] "Combatant functions" are described at 10 U.S.C. §§ 3062(b), 5012, 5013, 8062(c). These provisions set forth the responsibilities for maintaining armed forces in the Department of the Army, the Department of the Navy, the Marine Corps, and the Air Force, respectively. The distinction between combatant and non-combatant functions was described by Representative Vinson, Chairman of the House Armed Services Committee, as the difference between the fighting capacity of a service and its business functions, such as purchasing of food, furnishing of medical services, and running of Post exchanges. 104 Cong. Rec. 10891 (1958).

the significance accorded by the Framers of the Constitution to the legislative procedures of bicameral passage and presentment of legislation to the President for signature or veto, the Court held that any legislative action, if not specifically exempted in the Constitution itself, must comply with the procedures articulated in the Presentment Clauses, U.S. Const. art. I, § 7, cls. 2, 3. 462 U.S. at 946–51. The test devised in *Chadha* for identifying legislative action is whether the action has the effect of "altering the legal rights, duties and relations of persons, including . . . Executive Branch officials . . . , outside the legislative branch." *Id.* at 952. If the action constitutes an exercise of "legislative power," then the constitutional procedures of bicameral passage and presentment must be observed.

Section 125(a) authorizes two actions the constitutionality of which is affected by *Chadha.* First, it permits the Armed Services Committees of both Houses to determine what functions are "major combatant functions" and whether a proposed reorganization will "tend to impair the defense of the United States." Second, the statute permits either House to prevent a reorganization by passing a resolution disapproving it.

The first of these actions effectively empowers a committee of Congress either to approve a plan submitted by the Secretary or to take preliminary steps to postpone or defeat it. The committee is directed to use its own discretion to distinguish between "major" combatant functions and others and to make decisions regarding the defense of the United States. Thus the Secretary's statutory right to effect reorganizations and their timing are entirely contingent upon the committee's judgment as to whether the veto mechanism should be invoked. This function of the committee affects the rights, duties and relations of Executive Branch officials by subjecting the Secretary's plan to a possible one-house resolution and by triggering an additional forty-day continuous session waiting period during which the proposed action is suspended. The committee discretion authorized by § 125 is a legislative action, which must be accomplished, if at all, through the plenary legislative process.

The one-house veto authorized by the statute has the effect of nullifying the statutory discretion of the Secretary or reversing the exercise of that discretion, and thus alters the rights and relations of Executive Branch officials. This veto procedure, effected through the device of a one-house resolution, is precisely the kind of mechanism that the Supreme Court struck down in *Chadha.* As will be shown below, it was devised explicitly for the purpose of circumventing the plenary legislative process. This purpose is further evidence that the one-house action is legislative in character.

Finally, neither the committee action nor the one-house action authorized by § 125(a) falls among the exemptions from bicameral passage and presentment expressed clearly and unambiguously in the Constitution. *See* 462 U.S. at 955 (listing four constitutional provisions authorizing one-house action). Thus, both the committee suspension provision and the one-house veto device of § 125 are prohibited under *INS* v. *Chadha.*

# III. Severability

## A. Presumptions

The Secretary's statutory authority to reorganize combatant and non-combatant functions, notwithstanding the unconstitutionality of the veto mechanism, depends upon whether the delegation of power to do so under § 125 is severable from the unconstitutional provisions contained in the statute.

The severability of an unconstitutional provision from the rest of a statute presents a question of legislative intent: would Congress have wished the remainder of the statute to continue in effect had it recognized that the provision was unconstitutional? *See Dorchy* v. *Kansas,* 264 U.S. 286, 290 (1924). *"Unless it is evident* that the Legislature would not have enacted those provisions which are within its power, independent of that which is not," the invalid portion should be severed and the remaining statutory authority upheld. *INS* v. *Chadha,* 462 U.S. at 932 (citations omitted; emphasis added).

The Supreme Court thus expressed a presumption that constitutional provisions survive the excision of unconstitutional provisions, absent clear congressional intent to the contrary. The Court in *Chadha* declared that a further presumption of severability is accorded any statute that contains a severability clause. 462 U.S. at 932. Finally, the Court recognized a third important presumption in favor of severability: a provision is "presumed severable if what remains after severance 'is fully operative as a law.'" *Id.* at 934 (quoting *Champlin Refining Co.* v. *Corporation Comm'n,* 286 U.S. 210, 234 (1932)).

Identifying a severability clause that is specifically applicable to § 125 is a rather complicated endeavor. When this section was enacted as part of the Department of Defense Reorganization Act of 1958, that Act did not contain a severability clause. The National Security Act of 1947, however, which the 1958 Act amended, originally contained a severability clause. Ch. 343, 61 Stat. 509 (1947). Moreover, the Act which codified the National Security Act into positive law in 1956 also included a severability clause:

> If a part of this Act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this Act is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.[4]

We believe that this severability clause applies to the reorganization section at issue because of that section's status as an amendment to the National Security Act of 1947. Generally an amended statute is to be understood in the same sense as if it had been composed originally in its amended form.[5] *Blair* v.

---

[4] Act of Aug 10, 1956, ch. 1041, § 49, 70A Stat. 640. The 1956 Act repealed all sections of the 1947 Act that were covered by the provisions newly codified. *Id.* § 53, 70A Stat at 641.

[5] The reorganization section, originally codified as 5 U.S.C § 171a, was transferred to Title 10 in 1962. Pub. L. No. 87–651, title II, § 201(a), 76 Stat. 515 (1962). Congress at that time did not intend to make any substantive changes in the statute. S. Rep. No. 1876, 87th Cong , 2d Sess. 6, *reprinted in* 1962 U.S.C C.A.N. 2456.

*Chicago,* 201 U.S. 400, 475 (1906). Under *Chadha,* the severability clause creates an additional presumption of severability, which can be overcome only if legislative history demonstrates, clearly and unmistakably, that Congress would not have delegated the authority at issue if it had known that the veto mechanism was unconstitutional. *See* 462 U.S. at 932.

The third presumption, arising when what remains after severance is "fully operative as a law," is also applicable in the present circumstances. Without the legislative veto, which applies only to reorganizations of combatant functions, the Secretary's statutory power to reorganize combatant functions would operate just as his powers over non-combatant functions have operated. Thus any reorganization plan would be reported to the Armed Services Committees of both Houses, as specified in § 125, and would take effect after thirty days of continuous session if no preventative legislation were passed. The Secretary would be empowered to reorganize all statutory functions in the manner now prescribed for non-combatant functions alone — a report-and-wait scheme like the one upheld in *Chadha. Id.* at 935 & n.9.

## B. Legislative History

In assessing the effect of the various presumptions in the context of § 125, legislative history is the guide to congressional intent. During consideration of the Department of Defense Reorganization Act of 1958, Congress explicitly addressed the issue of how much control it wished to retain over the Secretary's exercise of delegated reorganization authority, but it did not allude to the possibility that the one-house veto might be an impermissible means for effecting this control. Rather, Congress appears to have considered three options: to maintain the then-existing scheme under which the Secretary had no statutory power to reorganize combatant functions, to permit these reorganizations in the unrestricted discretion of the Secretary subject only to a report-and-wait obligation, or to grant the reorganization power while retaining control over its exercise through some form of a congressional veto mechanism. Congress chose the last of these three options.

Before the 1958 amendments were passed, separate statutory sections governed the reorganization of non-combatant functions and combatant functions. The National Security Act of 1947, as amended, provided that all authorized functions of the Department of Defense other than combatant functions could be reorganized if a report was submitted in advance to the Armed Services Committees.[6] Combatant functions, however, with no further delineation made between "major" and "minor," could not be reorganized at all under the statute.[7]

The provision that finally became law as § 125 represented a compromise among the various stances urged by the President, the House, and the Senate,

---

[6] National Security Act of 1947, § 202(c)(1), as amended, ch. 412, 63 Stat. 580 (1949).

[7] National Security Act of 1947, § 202(c)(5), as amended, ch. 412, § 5, 63 Stat. 580 (1949).

respectively. Under a bill submitted by the President,[8] the Secretary of Defense would have had the ability to reorganize all functions, including combatant functions, thirty days after making a report to the Committees on Armed Services. Congress could have prevented a proposed reorganization only by plenary legislation presented to the President for signature.[9]

The House Committee on Armed Services criticized the bill on the ground that the President could be expected to veto any legislation that sought to prevent a reorganization proposed by the Secretary. The House anticipated that a two-thirds majority of each House would have been required to override a Presidential veto and prevent any reorganization.[10] "Here the Committee on Armed Services was faced with one of its most difficult problems: how to retain its constitutional responsibility[11] and at the same time give the Secretary of Defense the necessary flexibility to take action in the interests of economy and efficiency that would not impinge upon the responsibilities of the Congress."[12]

The House solution to its dilemma was a bill authorizing the Secretary to reorganize any non-combatant function by notifying Congress and waiting thirty days. Combatant functions, however, could be reorganized only after the Secretary had consulted with the Joint Chiefs of Staff, reported to Congress and waited thirty days. If objection were raised by any of the Joint Chiefs of Staff, a combatant function would become a "major" combatant function. The bill permitted Congress to prevent the reorganization of a major combatant function by adopting a concurrent resolution opposing the Secretary's plan.[13] Thus, under the House bill, congressional prevention of "minor" combatant and non-combatant reorganizations would have required enactment of a law and Presidential approval or a two-thirds vote in each House overriding the President, while a legislative veto of "major" combatant reorganizations would have required only opposition by a simple majority of each of the Houses of Congress. In the words of the House Report,

> The committee does not believe that it could give to the Secretary of Defense, or any member of the executive branch of the Government, the right to abolish, consolidate, transfer or reassign a major combatant function by simply notifying the Congress and then waiting 30 days. Such a grant of authority on the part of the Congress to the executive branch of the Government

---

[8] H.R. 11958, 85th Cong., 2d Sess. (1958).

[9] Report of the House Committee on Armed Services, H.R. Rep. No. 1765, 85th Cong., 2d Sess. 12 (1958) (House Report).

[10] *Id.* at 12.

[11] We assume that this reference to "constitutional responsibility" relates to Congress' Article I powers to raise and support armies, to provide and maintain a navy, and to make rules for the government of the land and naval forces. U.S. Const. art. I., § 8, cls. 12–15. Legislative history does not reveal whether the asserted responsibility was viewed as extending beyond the legislation necessary merely to constitute and to fund the armed forces.

[12] House Report, *supra*, at 12–13.

[13] *Id.* at 13.

would constitute a complete surrender of a Constitutional re-
sponsibility imposed upon the Congress.[14]

The Senate amendment to the House bill, substantially enacted in § 125,
provided that all reorganizations must be reported to the two Armed Services
Committees and would take effect after thirty days of continuous session.[15]
Either committee could report a resolution to its house recommending that the
proposal be rejected if, in the judgment of the committee, the plan involved a
"major combatant function" and "would impair the defense of the United
States." After a committee had reported such a resolution of disapproval to its
house, that house had forty additional days in which to adopt it by simple
majority vote. The resolution of either house would defeat the Secretary's
proposal.[16]

In conference, the House conferees agreed to the Senate amendment with
three modifications not here relevant.[17] In the view of the Conference Commit-
tee, "the provision agreed to with respect to combatant functions recognizes the
responsibility of the Congress as provided in the Constitution of the United
States. It preserves to the Congress its prerogative of making the final determi-
nation as to the military needs and requirements of our Nation."[18]

Thus, both the House and the Senate appear to have agreed that reorganiza-
tion of major combatant functions, albeit with somewhat different defini-
tions,[19] required some type of legislative control. Additionally, they agreed that
some alteration of the prior statutory scheme was necessary to provide flexibil-
ity to the Secretary.

## C. Analysis

*Chadha* instructs that the severability question is to be resolved by determin-
ing whether Congress intended the remainder of an act to stand if any particular
provision were held invalid. 462 U.S. at 931–32. The severability clause, of
course, attests to this intention. *See Consumer Energy Council of America* v.
*FERC,* 673 F.2d 425, 441 (D.C. Cir. 1982), *aff'd sub nom. Process Gas
Consumers Group* v. *Consumer Energy Council of America,* 463 U.S. 1216

---

[14] House Report, *supra,* at 14.

[15] Report of the Senate Committee on Armed Services, S. Rep. No 1845, 85th Cong., 2d Sess 6–7,
*reprinted in* 1958 U.S.C.C.A.N. 3272, 3278 (Senate Report).

[16] The reason for the Senate's revision of the method for determining "major" combatant functions was that
it believed no military official should have the power to delay a Presidential decision; rather, a committee of
Congress should perform that function. 104 Cong. Rec. 14263 (1958) (statement of Sen. Kefauver).

[17] H.R. Conf. Rep. No. 2261, 85th Cong., 2d Sess. 13–14, *reprinted in* 1958 U.S.C.C.A.N. 3272, 3284
(Conference Report). The modifications included a provision covering functions "now or hereafter" assigned
to the military services; an insertion of the words "tend to" in the phrase "would impair the defense of the
United States" as a ground for committee recommendation of disapproval; and an addition of words to clarify
that a resolution of disapproval of either House would require only a simple majority. *Id.*

[18] Conference Report, *supra,* at 14, *reprinted in* 1958 U.S.C.C A.N. at 3284–85.

[19] *Compare* House Report, *supra,* at 13 (combatant function becomes "major" if proposal objected to by
Joint Chiefs of Staff) *with* Senate Report, *supra,* at 5–6, *reprinted in* 1958 U S.C.C A.N at 3276 ("major
combatant functions" to be determined by Armed Services Committees).

88

(1983). A presumption of severability is not lightly overcome, *Carter* v. *Carter Coal Co.*, 298 U.S 238, 312 (1936), particularly in light of the *Chadha* Court's delineation of three separate sources for such a presumption.

Under the *Chadha* discussion of severability, there are three possible interpretations of the current effect of § 125: First, it is possible that all of § 125(a) is invalid and the Secretary has no power to reorganize any of the functions embraced by § 125(a), combatant and non-combatant alike. This conclusion would be required if the statute were not severable at all and the entire grant of authority contained in § 125(a) could no longer be given effect. Second, only the delegation of authority which the statute subjects to a one-house veto would fall, meaning that the Secretary no longer has any power to reorganize major combatant functions, but retains such authority with respect to all other functions. Such a reading would be the consequence of concluding that the unconstitutional legislative veto is severable from the grant of authority not subject to that veto, but is not severable from the grant of authority directly controlled by the veto. The third possibility is that the grant of reorganization authority stands, requiring only a report to Congress and a thirty-day wait for any reorganization to take effect. This interpretation would be the result of finding that only the legislative veto need be stricken and that the remainder of the statute is unaffected.

As we have already noted, Congress distinguished between the two different types of reorganizations contained in § 125: those that involve combatant functions and those that do not. The former are subject to a committee recommendation of disapproval; the latter are not. Under § 125(a) a proposal to effect a non-combatant reorganization simply becomes effective thirty days after the Secretary reports the plan to Congress. The provision as written provides a workable report-and-wait scheme for non-combatant functions entirely unrelated to the unconstitutional veto device. With respect to reorganizations of non-combatant functions, we have found no clear evidence of a legislative intent which would overcome the presumptions of severability. To the contrary, the structure of the statute is entirely consistent with severability.

The history of this section lends additional support for the distinct consideration of combatant and non-combatant functions, despite the current association of the two in § 125(a). As discussed above, separate statutory sections governed the reorganization of the two classes of functions before 1958. When, in 1958, the President requested report-and-wait authority for all reorganizations, Congress granted that request in part by readopting the report-and-wait scheme for non-combatant reorganizations. Both the House and Senate bills, although disagreeing on other aspects of the new plan, contained identical treatment of the power to reorganize non-combatant functions. This provision provoked no apparent controversy.

Thus, to strike all of § 125(a) as not severable from the unconstitutional veto provision would withdraw from the Secretary powers he enjoyed even before the addition of the legislative veto over combatant reorganizations in 1958. Congress gave no indication that its reenactment of the non-combatant reorga-

nization power was in any way dependent upon the enactment of the separate veto governing combatant functions. We therefore conclude that to strike the entire delegation of authority is not warranted.

The second possible interpretation of § 125(a), which would sever the power to reorganize non-combatant or "minor" combatant functions, but not the power to reorganize major combatant functions, is impeded somewhat by the phrasing of the statute. As § 125(a) now reads, abbreviated for clarity:

> a function . . . may not be substantially [reorganized] unless the Secretary reports the details . . . to the Committees on Armed Services of the Senate and House of Representatives. The [reorganization] takes effect . . . after . . . 30 days . . . unless either of those Committees, within that period, reports a resolution recommending that the [proposal] be rejected . . . because it . . . proposes to reorganize a major combatant function . . . and would, in its judgment, tend to impair the defense of the United States.

The manner in which Congress chose to word the statute makes differentiation between combatant and non-combatant reorganizations somewhat difficult mechanically. However, this problem could be overcome, because the legislative history seems to support a conclusion that Congress designed the statute for efficiency of words and not because it intended both types of reorganization to fail if the disapproval procedure regarding combatant reorganizations failed.

A more serious barrier to this interpretation lies in an additional constitutional problem implicit in the committee's channeling function described above. If the Secretary were to retain only the power to reorganize noncombatant and "minor" combatant functions, he would nonetheless be required to report all plans to the Armed Services Committees and to wait thirty days before implementing them. Combatant functions are defined by statute. The statute offers no guidance, however, for breaking down the "combatant" category into "major" and "minor." This determination is vested by § 125(a) in the sole discretion of the committees.

Thus, under this interpretation, if the Secretary were to submit a plan believed by him to contemplate the reorganization of "minor" combatant functions not impairing the national defense and thus within his power, his characterization of the plan would be subject to review and revision by the committees. If they disagreed with the Secretary's characterization, the committees' contrary characterization would have the effect of nullifying authorized Executive Branch actions. The committees, by hypothesis, would decide whether the particular power at issue fell within the portion of authority that had been stricken or within the portion that had been retained by the Secretary. This action of reviewing and revising is foreclosed by *Chadha* because it constitutes the exercise of legislative power, which may only be accomplished in the manner prescribed for legislation by the Constitution.[20]

---

[20] Alternatively, a committee's interpretation and enforcement of statutory directives could be viewed as an exercise of *executive* power, which the Supreme Court has held to be reserved to officers of the United States

Continued

Under this interpretation, therefore, the committees would not act merely as agents of Congress to receive executive reports pursuant to a valid report-and-wait procedure. Rather, they would hold discretionary and legislative powers unconstitutionally delegated to them by § 125(a). The committees' unconstitutional role in reviewing the Secretary's decisions precludes any interpretation of the statute that preserves the distinction between "major" combatant functions and others, as Congress has not chosen legislatively to define the difference. Consequently, we conclude that this interpretation is not consistent with *Chadha.*

The final of the three options identified above involves severance only of the unconstitutional veto mechanism and is consistent with the presumptions in favor of severability. It would leave undisturbed the Secretary's grant of authority to reorganize all functions, subject only to a report-and-wait requirement.

In 1958, when Congress amended the National Security Act of 1947, the Secretary's power to reorganize the statutorily defined functions of the Department of Defense extended only to non-combatant functions. At that time, Congress determined that "[o]ur defense organization must be flexible; it must be responsive to rapidly changing technologies; it must be dynamic and versatile," House Report, supra, at 2, and that the existing scheme was inadequate to meet those articulated needs. The House and Senate Reports reveal no disagreement with the proposition that the reorganization authority was in need of expansion; rather, the disagreement focused only on the manner in which such authority would be defined. The 1958 amendments, therefore, appear rooted in a consensus that the Executive Branch should be given increased flexibility in the area of defense reorganization.

As the legislative history discloses, however, Congress declined to allow the Secretary to enjoy this flexibility completely free of committee control. Simply severing the unconstitutional veto provision and leaving the Secretary's reorganization authority otherwise intact would, of course, effectively resurrect the scheme urged by the President in his bill at the time that Congress was considering the Department of Defense Reorganization Act of 1958. Both the House[21] and the Senate[22] expressed dissatisfaction with such report-and-wait authorization and preferred to retain a congressional veto for reorganizations of combatant functions. These objections unquestionably reflect a reluctance on the part of Congress to delegate unfettered discretion to the Secretary, given the clearly preferable alternative of retaining some congressional control. However, "[a]lthough it may be that Congress was reluctant to delegate final

[20] (. . . continued)
appointed pursuant to Article II. *Buckley* v. *Valeo,* 424 U.S. 1, 141 (1976). Furthermore, the committee's putative authority could be construed as *judicial* power, insofar as it involves the interpretation of the statute and review of executive action. This is a function reserved to the judiciary as established by Article III. *See Chadha,* 462 U.S. at 966 (Powell, J., concurring). Under any of these interpretations, the committee's authority to perform this function in the manner designated is inconsistent with the constitutional separation of powers.

[21] *See supra* note 14 and accompanying text.

[22] "The House Armed Services Committee quite rightly rejected this blank check to the administration." 104 Cong. Rec. 14263 (1958) (statement of Sen. Kefauver).

authority . . . , such reluctance is not sufficient to overcome the presumption of severability." *Chadha,* 462 U.S. at 932.

Rather, the question is "what Congress *would have intended,*" had it anticipated that the veto provision was unavailable. *Consumer Energy Council of America* v. *FERC,* 673 F.2d 425, 442 (D.C. Cir. 1982) (emphasis in original), *aff'd sub nom. Process Gas Consumers Group* v. *Consumer Energy Council of America,* 463 U.S. 1216 (1983). And, the presumptions all line up in favor of severability unless there is clear evidence of legislative intent to the contrary. In this context, we attempt to discern what Congress would have chosen to do if it had been required to choose between the complete executive flexibility afforded by the report-and-wait legislation on the one hand, and the complete inflexibility of the then prevailing law on the other. Unless the evidence clearly favors the latter interpretation, *Chadha* compels us to choose the former. Because the emphasis of the 1958 deliberations was a recognized need to remedy a flawed statutory scheme, we cannot conclude with confidence that the legislators would have refused to make any change in that scheme even if the only alternative had been to delegate discretion to the Secretary subject only to advance notice to Congress and the constitutional power legislatively to override the Secretary. Far from supporting a conclusion that Congress would have intended the Secretary's discretion to fall with the unconstitutional provision, the legislative history is silent on this subject. Because the courts have determined that in the face of silence, the presumption of severability must control,[23] we conclude that the unconstitutional portions of § 125(a) are severable from the delegation of authority to the Secretary.[24] The reports still required of the Secretary will provide Congress with oversight and the opportunity to exercise, through legislation, the control over reorganizations that it sought to preserve without undermining the constitutional scheme.

---

[23] Even in the absence of a severability clause and in the face of contrary statements by individual members of Congress, the United States Court of Appeals for the Fifth Circuit held a statute to be severable because there was no evidence that *severability* was actually considered. "Mere uncertainty about the legislature's intent is insufficient." *EEOC* v *Hernando Bank, Inc.,* 724 F.2d 2053, 2058 (5th Cir 1984); *accord Muller Optical Co.* v. *EEOC,* 574 F. Supp. 946, 953 (W D. Tenn. 1983). *Contra EEOC* v. *Allstate Ins. Co.,* 32 Fair Empl. Prac. Cas. (BNA) 1337 (S.D. Miss. 1983) (same statute not severable because absence of severability clause creates presumption against severability). Similarly, the D.C Circuit found that the provision before it was not "so essential to the legislative purpose that the statute would not have been enacted without it," despite some legislative history indicating that Congress intended the veto provision to protect against undesirable consequences. *Consumer Energy Council of America* v. *FERC,* 673 F.2d 425, 443, 445 n.70 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Group* v. *Consumer Energy Council of America,* 463 U.S. 1216 (1983). It thus rejected the test devised by the Fourth Circuit in *McCorkle* v. *United States,* 559 F.2d 1258, 1261 (4th Cir. 1977), *cert. denied,* 434 U.S. 1011 (1978), that severability is inappropriate when the veto restricts a grant of power. This test would have the effect of making "all veto provisions prima facie inseverable," *Consumer Energy Council,* 673 F.2d at 445 n.70, a result clearly at odds with the subsequently decided *Chadha* case.

[24] This conclusion is facilitated by the language of the statute itself, which provides that any reorganization takes effect after thirty days *unless veto action is initiated.* The effect of severance is accomplished merely by striking the qualifications following the word "unless." Similarly, this conclusion obviates consideration of the additional forty-day waiting period. That period is triggered by one unconstitutional action and is designed to facilitate another We believe, therefore, that it is no longer effective.

92

We defer to officials of the Department of Defense to analyze the effect of our conclusions upon the validity of any particular plan of reorganization currently under consideration. We do not believe we should attempt to resolve the specific issues that you have raised, which undoubtedly implicate areas in which your experience and knowledge are superior. However, should you continue to have questions about specific proposals, we would be pleased to address them in the context of a detailed factual background.

## Conclusion

In the absence of clearly expressed legislative intent regarding what Congress would have done had it known that the legislative veto alternative was constitutionally unavailable, we have concluded that the delegation of authority to the Secretary of Defense to reorganize all functions is severable from the one-house veto controlling the exercise of certain aspects of that authority. Because the veto contained in § 125 is unconstitutional under *Chadha*, and because Congress failed to indicate clearly and unmistakably that the delegation would not have been made if Congress could not have retained a veto power, we believe the courts would find that the reorganization authority survives the fall of the veto. Thus we conclude that the Secretary, under the valid remainder of § 125(a), may exercise the statutory grant of power to effect reorganizations of all functions, subject only to a thirty-day report-and-wait requirement.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

93