38 A.3d 620 (2012)
424 N.J. Super. 410
In re PLAN FOR the ABOLITION OF the COUNCIL ON AFFORDABLE HOUSING AND PROVIDING FOR the TRANSFER OF the FUNCTIONS, POWERS, AND DUTIES OF the COUNCIL ON AFFORDABLE HOUSING TO the DEPARTMENT OF COMMUNITY AFFAIRS, REORGANIZATION PLAN 1-2011.
Docket No. A-6301-10T4
Superior Court of New Jersey, Appellate Division.
Argued February 15, 2012.
Decided March 8, 2012.
Adam M. Gordon argued the cause for appellant Fair Share Housing Center (Fair Share Housing Center, attorneys; Mr. Gordon and Kevin D. Walsh, Cherry Hill, on the briefs).
Geraldine Callahan, Deputy Attorney General, argued the cause for respondents Governor Chris Christie and New Jersey Council on Affordable Housing (Jeffrey S. Chiesa, Attorney General, attorney; Robert Lougy, Assistant Attorney General, of counsel; Ms. Callahan and George N. Cohen, Deputy Attorney General, on the briefs).
Fox Rothschild, LLP, attorneys for amici curiae, Housing and Community Development Network of New Jersey, Corporation for Supportive Housing, and Mercer Alliance to End Homelessness (Henry L. Kent-Smith, Lawrenceville, of counsel and on the brief).
Before Judges CARCHMAN, FISHER and NUGENT.
The opinion of the court was delivered by
*621 CARCHMAN, P.J.A.D.
The issue raised in this appeal is whether, pursuant to the Executive Reorganization Act of 1969, N.J.S.A. 52:14C-1 to -11 (Reorganization Act), a Governor may abolish an independent agency created by the Legislature that is "in but not of" a department of the Executive Branch. As applied here, the narrower issue is whether respondent Governor Chris Christie may, under the terms of the Reorganization Act, "abolish" the Council on Affordable Housing (COAH), an independent agency created by the Fair Housing Act, N.J.S.A. 52:27D-301 to -329 (FHA), and transfer the duties, responsibilities and obligations of that agency to the sole authority of the Commissioner of the Department of Community Affairs (DCA).
Strictly construing the Reorganization Act, we conclude that it does not grant the Governor the power to abolish a legislatively created, representative, independent authority that is "in but not of" the Executive Branch or any department in that branch of the government. Applying this rule here, we determine that the Governor exceeded his authority under the Reorganization Act in abolishing COAH. Accordingly, we reverse.

I.
The relevant facts are not in dispute.
In Southern Burlington County NAACP v. Township of Mount Laurel, 92 N.J. 158, 456 A.2d 390 (1983) (Mount Laurel II), and Southern Burlington County NAACP v. Township of Mount Laurel, 67 N.J. 151, 336 A.2d 713, cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) (Mount Laurel I), the Supreme Court held that New Jersey's municipalities have the constitutional obligation to provide an adequate opportunity for the development of affordable housing, a holding that has become known as the Mount Laurel Doctrine. In 1985, the Legislature codified the Mount Laurel Doctrine by enacting the FHA. Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 513, 803 A.2d 53 (2002). The Legislature further established COAH as the entity charged with implementing and administering the legislative mandates of the FHA. Ibid.
COAH reflected the Legislature's intent to create a representative and independent entity to address affordable housing issues. The FHA mandated the membership of COAH, see N.J.S.A. 52:27D-305, and provided detailed specifications regarding its members' qualifications, terms of office, vacancies, compensation, nominations and removals. In its most recent iteration,[1]N.J.S.A. 52:27D-305 provides:
a. There is established in, but not of, the Department of Community Affairs a Council on Affordable Housing to consist of 12 members appointed by the Governor with the advice and consent of the Senate, of whom four shall be elected officials representing the interests of local government, at least one of whom shall be representative of an urban municipality having a population in excess of 40,000 persons and a population density in excess of 3,000 persons per square mile, at least one of whom shall be representative of a municipality having a population of 40,000 persons or less and a population density of 3,000 persons per square mile or less, and no more than one of whom may be a representative of the interests of county government; four shall represent the interests of households in need of low and *622 moderate housing, one of whom shall represent the interests of the nonprofit builders of low and moderate income housing, and shall have an expertise in land use practices and housing issues, one of whom shall be the Commissioner of Community Affairs, ex officio, or his or her designee, who shall serve as chairperson, one of whom shall be the executive director of the agency, serving ex officio; and one of whom shall represent the interests of disabled persons and have expertise in construction accessible to disabled persons; one shall represent the interests of the for-profit builders of market rate homes, and shall have an expertise in land use practices and housing issues; and three shall represent the public interest. Not more than six of the 12 shall be members of the same political party. The membership shall be balanced to the greatest extent practicable among the various housing regions of the State.
b. The members shall serve for terms of six years, except that of the members first appointed, two shall serve for terms of four years, three for terms of five years, and three for terms of six years. All members shall serve until their respective successors are appointed and shall have qualified. Notwithstanding the above, a member appointed to represent the interests of local government shall serve only such length of the term for which appointed as the member continues to hold elected local office....
c. The members, excluding the executive director of the agency and the Commissioner of Community Affairs, shall be compensated at the rate of $ 150.00 for each six-hour day ... spent in attendance at meetings and consultations....
d. The Governor shall nominate the members within 30 days of the effective date of this act and shall designate a member to serve as chairman throughout the member's term of office and until his successor shall have been appointed and qualified....
e. Any member may be removed from office for misconduct in office, willful neglect of duty, or other conduct evidencing unfitness for the office, or for incompetence. A proceeding for removal may be instituted by the Attorney General in the Superior Court....
[(Emphasis added).]
The Legislature took extraordinary steps to insulate COAH from the control of a single political party. In addition to requiring representation of certain designated constituent interests, the Legislature ordained that COAH be bipartisan, with no more than six members from one political party; moreover, removal of a member required a proceeding initiated by the Attorney General, to be heard in the Superior Court.
On February 9, 2010, the Governor issued Executive Order No. 12, creating a Housing Opportunity Task Force charged with reviewing the FHA, the State Planning Act (N.J.S.A. 52:18A-196 to -207), COAH's then-present and former regulations and methodologies, and "the continued existence of COAH." 42 N.J.R. 659(a) (March 15, 2010). The task force was to report to the Governor within ninety days; paragraph five of the Order required that, during those ninety days, "COAH [was to] refrain from taking any further action to process applications for substantive certification or to take [sic] any other actions to implement the Third Round regulations," allowing, however, for a "good cause" exception to the provision.
Appellant Fair Share Housing Center challenged Executive Order No. 12 in In re Executive Order on the Council on Affordable Housing, A-2693-09, and we stayed implementation of paragraph five *623 pending appeal. On March 20, 2010, after the Task Force's review was completed, the Governor issued Executive Order No. 20, rescinding Executive Order No. 12, 42 N.J.R. 752(a) (April 19, 2010), thereby rendering that appeal moot.
The Legislature also sought to abolish COAH, and to implement its intent, it enacted Senate Bill No. 1 on January 10, 2011. However, that bill was substantially amended by the time it was passed by the Assembly, and the Governor conditionally vetoed it, expressing a preference for the original Senate version. The bill was withdrawn from legislative consideration following the conditional veto.
On June 29, 2011, the Governor issued the reorganization plan (the plan) in dispute here. 43 N.J.R. 1621(a) (August 1, 2011). The plan's stated purpose was to abolish COAH, "thereby reducing expenditures and promoting economy and efficiency in the operations of the executive branch by eliminating a costly and burdensome regulatory agency." 43 N.J.R. 1621. The plan's general purpose was "to reduce the unnecessary complexity of affordable housing administration in New Jersey, lower the administrative costs associated with the present regulatory process, and streamline the development of new housing projects." Ibid. The plan noted that the DCA, in addition to overseeing and providing assistance to municipalities, "also operates numerous affordable housing programs funded by the Department of Housing and Urban Development and the State of New Jersey." Ibid. According to the plan, "[t]he performance of these obligations [could] be significantly improved and streamlined by consolidating the statutory functions, powers, and duties of [COAH] with those of the [DCA]." Ibid. Accordingly, the plan transferred all of COAH's functions, powers, duties, and personnel to the DCA Commissioner's authority and "abolished" the terms of office of all existing COAH members. Ibid.
The plan asserted that this transfer would result in "significant cost savings to State and local government taxpayers," who would "be freed from the sometimes inconsistent directions provided by COAH and the [DCA], thereby reducing the legal and administrative costs resulting from regulatory uncertainty." Ibid. According to the plan, the DCA could "effectively manage the State's affordable housing obligations without the necessity of the multi-member Council and a separate full-time staff" and without needing to compensate COAH board members for their "time, travel costs, and attendance at meetings." Ibid.
The plan also claimed that it would:
address the needs of both the providers and beneficiaries of affordable housing in New Jersey by organizing all programs within a single regulatory body. Consolidating the authority for housing in the [DCA would] reduce bureaucracy and foster predictability and consistency for developers and housing advocates alike, curb procedural inefficiencies and maneuvering, resulting litigation, and unreasonable delays and costs to municipalities and the private sector, while appropriately increasing the availability of affordable housing throughout the state.
[Ibid.]
In sum, tracking the language of the Reorganization Act, the Governor asserted that the plan was needed to:
1. Promote the better execution of the laws, the more effective management of the Executive branch and of its agencies and functions, and the expeditious administration of the public business;

*624 2. Reduce expenditures and promote economy consistent with the efficient operation of the Executive;
3. Increase the efficiency of the operations of the Executive;
4. Group, co-ordinate, and consolidate functions of the Executive according to major purposes; and
5. Eliminate overlapping and duplication of effort.
[Ibid.]
The plan noted that it was filed with the Secretary of State on June 29, 2011, and that it would become effective sixty days after that date unless the Legislature adopted a concurrent resolution of disapproval. 43 N.J.R. 1622.
According to the legislative schedule, the Legislature canceled its June 30, 2011 session, which had been the only session scheduled between June 29, 2011 and the end of August. In other words, the Legislature was originally scheduled to meet during the sixty-day period only once (the day after the plan was submitted), and ultimately, did not meet at all during the sixty-day period.
Appellant notes various differences between the operating procedures of COAH (before the reorganization) and the Commissioner (following the reorganization) and claims that these differences undermine the legislative underpinning of both COAH and the FHA.[2] According to appellant, whereas under COAH, "all decisions were made at public meetings with the opportunity for the public to speak," the DCA Commissioner "has taken the position... that because she, unlike COAH, is not a public body subject to the Open Public Meetings Act, N.J.S.A. 10:4-6 et seq.[,] she may decide motions in private on any timetable she wishes."
Appellant cites three sources as evidence of these differences. The first is an opinion letter from the DCA regarding a particular application. Among other things, the opinion letter recites that "since [COAH] no longer exists, there is no requirement that public meetings be held to consider such requests." The second is another opinion letter regarding that same application, in which the Commissioner determines that, "since there no longer is a public body implementing [COAH's] regulations, any regulatory requirements for a public meeting are no longer applicable." The third is a recent decision of the Commissioner "involving the financial feasibility of a proposed development." This decision relied upon a report that, according to appellant, "was never presented in public or made available to the parties." Based on this report, the Commissioner determined that a subdivision approval allowing for fifteen units need only provide two affordable housing units because a third affordable housing unit would not be "economically feasible."

II.
We now address appellant's argument challenging the Governor's reorganization of an "in but not of" agency. Appellant maintains that the Reorganization Act does not apply to such "in but not of" agencies because the Act defines "agency" as entities "of" (as opposed to "in but not of") the Executive Branch. See N.J.S.A. 52:14C-3(a)(1). Appellant bases this contention on a number of factors.
*625 First, appellant contrasts the language of the Reorganization Act with language from other statutes to demonstrate that the Legislature intended to provide the Reorganization Act with different, narrower treatment. For example, appellant cites the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15 (APA), enacted one year before the Reorganization Act, and an ethics law, N.J.S.A. 52:13D-13, enacted two years later, both of which define agencies as including entities "within" the departments of the Executive Branch. Similarly, appellant contends that the Legislature recognized the distinction between agencies "in" rather than "of" the Executive Branch during its creation of the Office of the Public Defender, the New Jersey Public Broadcasting Authority and other similar independent agencies. Appellant opines that the same Legislature that struggled to protect the independence of those entities did not grant the Governor the power to abolish such independent entities through the expedited process sanctioned by the Reorganization Act.
Second, appellant argues that the purpose and history of the Reorganization Act support the conclusion that "in but not of" agencies are outside of the Reorganization Act's scope, and that such a result is consistent with the approach advanced at the 1947 Constitutional Convention. Appellant also observes that no Governor has ever eliminated an "in but not of" agency under the Reorganization Act and, until creation of this plan, even the present Governor had sought legislative approval to alter such agencies.
Third, appellant claims that courts addressing matters pertaining to "in but not of" agencies have made similar distinctions, and have recognized the Legislature's intent to create a "particular balance of control" regarding those agencies. Appellant argues that COAH's enabling legislation established such a delicate balance of control, as evidenced not only by its use of the phrase "in but not of," but also by its detailed attention to the composition of its Council. Accordingly, the Legislature could not have intended to allow the Governor to unilaterally disrupt that balance.
Finally, appellant contends that to interpret the Reorganization Act in a way that permits the Governor to reorganize an independent agency such as COAH would violate New Jersey's constitutional separation of powers.
The Governor responds that the reorganization plan falls within his authority under the Reorganization Act. The Governor notes that the FHA created COAH "in but not of" the DCA, as opposed to "in but not of" the Executive Branch, and he asserts that this is a distinction with a difference. Because COAH was part of the Executive Branch, the Governor maintains it was "necessarily included in the definition of `agency' in the Reorganization Act." The Governor notes that the Reorganization Act specified certain types of reorganization that were prohibited, N.J.S.A. 52:14C-6, and the reorganization of independent "in but not of" agencies was not in that list. Therefore, claims the Governor, the Legislature granted the authority to reorganize those independent entities, just as other Governors have done in the past.[3]
*626 That interpretation, asserts the Governor, is consistent with the 1947 Constitutional Convention's intent to create a strong Governor with authority to control the twenty principal departments. Moreover, the Governor alleges that the FHA will still be effectuated because the plan "simply `rearranges what already exists' and does not attempt to confer any `new or different authority' upon the Commissioner."
Amici Curiae Housing and Community Development Network of New Jersey, the Corporation for Supportive Housing, and the Mercer Alliance to End Homelessness assert that the legislatively mandated diverse yet representative membership of COAH reflects the "voices of the competing interests," and "provide[s] balance" to the decisionmaking process, as required by the FHA. Without this balance, they assert, "the unilateral actions by the Commissioner permitted under [the plan] will go unchallenged and unchecked."

III.
The Reorganization Act sets forth the following:
(a) The Governor shall from time to time examine the organization of all agencies and shall determine what changes therein are necessary to accomplish the following purposes:
(1) To promote the better execution of the laws, the more effective management of the Executive branch and of its agencies and functions, and the expeditious administration of the public business;
(2) To reduce expenditures and promote economy to the fullest extent consistent with the efficient operation of the Executive;
(3) To increase the efficiency of the operations of the Executive to the fullest extent practicable;
(4) To group, co-ordinate, and consolidate agencies and functions of the Executive, as nearly as may be, according to major purposes;
(5) To reduce the number of agencies by consolidating those having similar functions under a single head, and to abolish such agencies or functions there-of *627 as may not be necessary for the efficient conduct of the Executive; and
(6) To eliminate overlapping and duplication of effort.
(b) The Legislature declares that the public interest demands the carrying out of the purposes of subsection (a) of this section and that the purposes may be accomplished in great measure by proceeding under this act, and can be accomplished more speedily thereby than by the enactment of specific legislation.
[N.J.S.A. 52:14C-2.]
Because the Governor is directed to "examine the organization of all agencies," we must consider what entities the Legislature intended to address in the Reorganization Act. "Agency" is defined in the Reorganization Act as:
(1) Any division, bureau, board, commission, agency, office, authority or institution of the executive branch created by law, whether or not it receives legislative appropriations, or parts thereof;
(2) Any office or officer in any agency, but does not include the State Auditor[.]
[N.J.S.A. 52:14C-3(a) (emphasis added).]
Before addressing that definition of "agency" in greater detail, we deem it appropriate to review the overall scheme of the Reorganization Act. Under the Reorganization Act, the Governor shall prepare a reorganization plan containing fact findings and transmit the plan to the Legislature when the Governor finds, after investigation, that doing one or more of the following is "necessary to accomplish one or more of the purposes" of the Reorganization Act, set forth in N.J.S.A. 52:14C-2:
(1) The transfer of the whole or a part of an agency, or of the whole or a part of the functions thereof, to the jurisdiction and control of another agency; or
(2) The abolition of all or a part of the functions of an agency; or
(3) The consolidation, merger, or co-ordination of the whole or a part of an agency, or of the whole or a part of the functions thereof, with the whole or a part of another agency or the functions thereof; or
(4) The consolidation, merger, or co-ordination of a part of an agency or the functions thereof with another part of the same agency or the functions thereof; or
(5) The authorization of an officer to delegate any of his functions; or
(6) The abolition of the whole or a part of an agency which agency or part does not have, or on the taking effect of the reorganization plan will not have, any functions[.]
[N.J.S.A. 52:14C-4(a).]
Among other provisions not relevant here, N.J.S.A. 52:14C-5 authorizes the Governor to appoint and provide compensation for a new agency head, which "may be an individual or may be a commission or board with more than one member...." The Reorganization Act is silent about the abolition of a multi-member commission or board.
The Legislature also set forth certain prohibitions, none of which is directly relevant to resolving the issues before us:
(a) A reorganization plan may not provide for, and a reorganization under this act may not have the effect of
(1) Creating a new principal department in the Executive branch, abolishing or transferring a principal department or all the functions thereof, or consolidating 2 or more principal departments or all the functions thereof;

*628 (2) Continuing an agency beyond the period authorized by law for its existence or beyond the time when it would have terminated if the reorganization had not been made;
(3) Authorizing an agency to exercise a function which is not expressly authorized by law at the time the plan is transmitted to the Legislature;
(4) Increasing the term of an office beyond that provided by law for the office.
[N.J.S.A. 52:14C-6.]
The Reorganization Act further provides that a reorganization plan "shall take effect at the end of a period of 60 calendar days" after the date of concurrent transmittal to the Senate and Assembly while both bodies are in session "unless, between the date of transmittal and the end of the 60-day period, the Legislature passes a concurrent resolution stating in substance that the Legislature does not favor the reorganization plan." N.J.S.A. 52:14C-7(a). If not disapproved in that manner, the plan "shall have the force and effect of law." N.J.S.A. 52:14C-7(c). All acts or parts of acts inconsistent with a reorganization plan "are, to the extent of such inconsistency, ... repealed." N.J.S.A. 52:14C-11.
With that structure in mind, we again note that the Reorganization Act defines "agency" in relevant part as "[a]ny division, bureau, board, commission, agency, office, authority or institution of the executive branch created by law." N.J.S.A. 52:14C-3(a) (emphasis added). That definition does not include or reference either "independent agencies" or "in but not of" agencies. This is noteworthy. The "in but not of" language reflects the fact that, under the New Jersey Constitution, all agencies are constitutionally required to be housed in one of the twenty executive departments, N.J. Const. art. V, § 4, ¶ 1, as well as the drafters' recognition that some agencies required a "quasi-independent" status, beyond the reach of the otherwise strong executivethe Governor. For example, at the time of the 1947 Constitutional Convention, the Committee on the Executive, Militia and Civil Officers considered how to organize a "quasi-independent" entity, such as the Public Utilities Commission. 5 Proceedings of the Constitutional Convention of 1947 371 (1951). It was recommended that such entities be under the Governor's "supervision" but not under the Governor's "supervision and control." 5 Proceedings of the Constitutional Convention of 1947, supra, at 371-73.
Soon after the adoption of the 1947 Constitution, the Supreme Court considered the nature and status of "quasi-independent" agencies in New Jersey Turnpike Authority v. Parsons, 3 N.J. 235, 69 A.2d 875 (1949). Rejecting an assertion that the Turnpike Authority was an alter ego of the State because it was "in the State Highway Department," the Court wrote:
This statutory provision is manifestly intended to be a compliance with the constitutional provision requiring that "all executive and administrative offices, departments, and instrumentalities of the State government, including the offices of Secretary of State and Attorney General, and their respective functions, powers and duties, shall be allocated by law among and within not more than twenty principal departments," [N.J. Const. art. V, § 4, ¶ 1]. But the State Highway Commissioner is given no authority whatsoever over the Turnpike Authority. The Turnpike Authority is in but not of the State Highway Department and that fact does not make it any the less an independent entity, as the language of the entire Act clearly demonstrates.

*629 [Id. at 244, 69 A.2d 875 (emphasis added).]
This "in but not of" language is the most common means of identifying those agencies that the Legislature intended to be independent and outside the scope of Executive controlincluding the Executive's reorganization powerwhile also abiding by the constitutional mandate allocating every agency, independent or otherwise, to an established department in the Executive Branch. Examples include: the Domestic Companion Animal Council, N.J.S.A. 4:19A-16a ("There shall be established in, but not of, the Department of Health, a Domestic Companion Animal Council ...."); the New Jersey Casino Control Commission, N.J.S.A. 5:12-50 ("The New Jersey Casino Control Commission... is hereby created in but not of the Department of the Treasury."); the Casino Reinvestment Development Authority, N.J.S.A. 5:12-153a ("There is established in, but not of, the Department of the Treasury a Casino Reinvestment Development Authority ...."); the Hackensack Meadowlands Development Commission, N.J.S.A. 13:17-5(a), (establishing the Hackensack Meadowlands Development Commission "in, but not of, the Department of Community Affairs ...."); the Garden State Preservation Trust, N.J.S.A. 13:8C-4a (establishing the Garden State Preservation Trust "in but not of the Department of the Treasury ...."); and the New Jersey Economic Development Authority, N.J.S.A. 34:1B-4(a) (establishing the New Jersey Economic Development Authority "in but not of, the Department of the Treasury....").[4] With greater specificity, N.J.S.A. 11A:2-1 provides:
There is established in, but not of, the Department of Labor and Workforce Development in the Executive Branch of State government the Civil Service Commission. For the purpose of complying with the provisions of Article V, Section IV, paragraph 1 of the New Jersey Constitution, the Civil Service Commission is allocated within the Department of Labor and Workforce Development, but, notwithstanding this allocation, the commission shall be independent of any supervision or control by the department or by any officer or employee thereof.

[(emphasis added).]
Moreover, a broader examination of COAH's enabling legislation as a whole demonstrates that it represents a carefully crafted statutory scheme incorporating procedures that (1) reflect COAH's unique mission in implementing a constitutional mandate and (2) are designed to deal with extant issues confronting affordable housing. For example, COAH's appointment provisions required a twelve-member board, consisting of: four elected officials representing the interests of local governments, including at least one urban municipal representative and one representative from a smaller municipality; four members representing the interests of low- and moderate-income households, including one member to represent a nonprofit builder of low- and moderate-income housing and another member to represent the interests of disabled persons and to have expertise in construction accessible to disabled persons; one member representing the interests of for-profit builders of market *630 rate homes; and three members representing the public interest. As we have noted, no more than six members could be of the same political party, and the membership was to be "balanced to the greatest extent practicable among the various housing regions of the State." N.J.S.A. 52:27D-305a.
N.J.S.A. 52:27D-305b also provided that members would serve six-year terms, with staggered starting dates, and would carry over until successors were appointed and qualified. Finally, in N.J.S.A. 52:27D-305e, the Legislature provided that any COAH member "may be removed from office for misconduct in office, willful neglect of duty, or other conduct evidencing unfitness for the office, or for incompetence. A proceeding for removal may be instituted by the Attorney General in the Superior Court." The plan unilaterally ended all of the COAH members' terms and vested the authority to administer the FHA in a commissioner who serves at the pleasure of the Governor. The Governor's new plan sacrificed the goals of independence and continuity suggested by COAH's design.
All of these membership provisions of N.J.S.A. 52:27D-305 represented legislative judgments about who should influence and establish New Jersey's affordable housing policies through their participation in the agency's decisionmaking process. The legislative goal of balanced representation embodied by COAH's membership composition is lost under the plan. This issue potentially implicates not only COAH, but also other independent agencies such as those previously mentioned. The enabling statutes for many of these agencies incorporate great specificity, similar to that of the COAH statute, regarding the qualifications and terms of appointment for members of the entity. See, e.g., N.J.S.A. 5:12-153a and b; N.J.S.A. 13:17-5(b) and (c); N.J.S.A. 34:1B-4b. Nothing in the Reorganization Act suggests that the Legislature intended the membership specifications of independent agencies such as these to be summarily replaced by whatever membership and structure a governor might select in a reorganization plan. Without clear direction in the Reorganization Act that it should apply to independent agencies, there is no basis from which to infer that the Legislature intended to permit a governor to undo such a balanced representation scheme through a reorganization plan.

IV.
There are even more compelling reasons to conclude that COAH was not subject to the Reorganization Act. The Governor's reorganization power implicates separation of powers concerns between the Executive and Legislative branches of government. Although these constitutional issues need not be resolved, the constitutional context lends credence to and is instructive regarding the conclusion that the Reorganization Act was not intended to apply to independent "in but not of" agencies. A constitutional analysis informs us that the extant issues here were the subject of debate and ultimate resolution in other fora.
We commence our analysis by discussing appellant's contention that the application of the Reorganization Act to independent agencies violates the Constitution's separation-of-powers mandate.
A review of the 1947 Constitutional Convention informs us in assessing the validity of appellant's claim. The Convention rejected a proposal that would have allowed reorganizations by the Governor subject to a legislative veto. Instead, the delegates found that proposal "inconsistent with an effective separation of the powers of government among the three branches." 2 *631 Proceedings of the Constitutional Convention of 1947, supra, at 1126.
In Communications Workers of America v. Florio, 130 N.J. 439, 449-50, 617 A.2d 223 (1992) (CWA), the Court addressed separation-of-powers concerns identical to those at issue here:
Article III, paragraph 1 of the New Jersey Constitution reads:
The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.
The doctrine of separation of powers is a fundamental principle of our State government. The separation-of-powers article first appeared in substantially its present form in the New Jersey Constitution of 1844. It was designed to "maintain the balance between the three branches of government, preserve their respective independence and integrity, and prevent the concentration of unchecked power in the hands of any one branch." David v. Vesta Co., 45 N.J. 301, 326 [212 A.2d 345] (1965) (footnote and emphasis omitted).
Despite the explicit constitutional mandate that "contemplates that each branch of government will exercise fully its own powers without transgressing upon powers rightfully belonging to a cognate branch," Knight v. Margate, 86 N.J. 374, 388 [431 A.2d 833] (1981), we have always recognized that the doctrine requires not an absolute division of power but a cooperative accommodation among the three branches of government. General Assembly v. Byrne, 90 N.J. 376, 382 [448 A.2d 438] (1982); Knight v. Margate, [86 N.J. 374, 388, 431 A.2d 833 (1981)]; Brown v. Heymann, 62 N.J. 1, 11 [297 A.2d 572] (1972).
In one of the first cases to address the separation-of-powers doctrine under the 1947 Constitution, Chief Justice Vanderbilt recognized that a rigid and inflexible classification of the branches of government into mutually-exclusive, water-tight compartments would "render government unworkable." Massett Bldg. Co. v. Bennett, 4 N.J. 53, 57 [71 A.2d 327] (1950). More recently we expressed the same thought in In re Salaries for Probation Officers, 58 N.J. 422, 425 [278 A.2d 417] (1971): "The compartmentalization of governmental powers among the executive, legislative and judicial branches has never been watertight."

[CWA, supra, 130 N.J. at 449-50, 617 A.2d 223.]
The New Jersey Constitution provides that "[t]he legislative power shall be vested in a Senate and General Assembly," N.J. Const. art. IV, § 1, ¶ 1, and "[t]he executive power shall be vested in a Governor." N.J. Const. art. V, § 1, ¶ 1. The Constitution further provides:
Each principal department shall be under the supervision of the Governor. The head of each principal department shall be a single executive unless otherwise provided by law. Such single executives shall be nominated and appointed by the Governor, with the advice and consent of the Senate, to serve at the pleasure of the Governor during the Governor's term of office and until the appointment and qualification of their successors, except as herein otherwise provided with respect to the Secretary of State and the Attorney General.
[N.J. Const. art. V, § 4, ¶ 2.]
*632 In CWA, the Court noted that a "`prime objective of the 1947 Constitutional Convention was to create a strong executive,'" with the aim "to make the principal departments of government subject to gubernatorial supervision so as to form a streamlined, modern, and accountable executive branch." CWA, supra, 130 N.J. at 455, 617 A.2d 223 (quoting Robert F. Williams, The New Jersey State Constitution, A Reference Guide 79 (1990)).
In Kenny v. Byrne, 144 N.J.Super. 243, 365 A.2d 211 (App.Div.1976), aff'd o.b., 75 N.J. 458, 383 A.2d 428 (1978), we rejected a challenge to an executive order requiring certain Executive Branch employees to file financial disclosure statements, concluding that the executive order was within the Governor's authority. We focused on the 1947 Constitution's recognized objective to create a strong executive:
To achieve this goal, the major principles of modern state administrative reorganization were incorporated into the 1947 Constitution:
"These principlesdirected toward the achievement of maximum efficiency and economy in the execution of State administrative activities, are:
(1) integration of all administrative activities of the State along functional lines within a few well-balanced principal departments;
(2) establishment of direct lines of responsibility for the administration of such functions and activitiesfrom the Governor, through the department heads, to the subordinate officers of each department;
(3) providing the Governor with executive authority commensurate with his responsibilities to the people of the State,...."
[Id. at 251, 365 A.2d 211 (quoting Leon S. Milmed, The New Jersey Constitution of 1947, in N.J.S.A. Const. 91 at 103-04).]
In CWA, the Court recognized our understanding in Kenny that "`[u]nmistakably, the executive power reposed in the Governor under the Constitution ... must be given life and meaning by investing him with the authority to implement his responsibilities.... To conclude otherwise is to negate the intent of the framers of the Constitution of 1947.'" CWA, supra, 130 N.J. at 456, 617 A.2d 223 (quoting Kenny, supra, 144 N.J.Super. at 251, 365 A.2d 211).
The CWA Court further acknowledged that "[s]eparation-of-powers questions can arise when a branch delegates some of its own power away, ... or when a branch takes unto itself some of the powers of another branch.... Although both the giving and taking of power can be constitutional if not excessive, the taking of power is more prone to abuse and therefore warrants an especially careful scrutiny." Id. at 456-57, 617 A.2d 223.
Of critical note, the Constitutional Convention considered the scope of the Governor's reorganization authority. The Convention's Committee on Executive, Militia and Civil Officers described its analysis in its report to the Convention when it said:
Your Committee has followed the principle that the Governor should be strong in his branch of the government, but that he should be precluded from infringing upon the other branches. For example, this committee's proposal, and the proposals of the Committee on the Legislative, with which this committee is in agreement, provide for the legislative right of self-call, for limiting the Governor's power of ad interim appointment, for abolishing the pocket veto, for automatic special session of the Legislature to reconsider vetoed bills after adjournment by the Legislature sine die.

*633 Similarly, the important power of reorganization of State departments and the allocation of existing departments among and within not more than 20 principal departments, is by this Committee's proposal vested in the Legislature. In its nature, a reorganization may well require amendment or revision of the law governing the various agencies concerned. This authority is, accordingly, left with the Legislature rather than transferred to the Governor for exercise by executive order.

Your Committee recognizes that the administrative powers of the Governor's branch should provide for a clear line of command. It also recognizes that the assignment of power to the Governor alone to reorganize the departments would be inconsistent with an effective separation of the powers of government among the three branches.
[2 Proceedings of the Constitutional Convention, supra at 1126 (emphasis added).]
The reorganization authority was not constitutionally vested in the Governor; only later did the Legislature confer its reorganization authority upon the Governor under the Reorganization Act. That Act's constitutionality was upheld in Brown v. Heymann, 62 N.J. 1, 4, 297 A.2d 572 (1972), which concerned a challenge to a reorganization plan for the Department of Labor and Industry that the Governor adopted under the then-extant Reorganization Act. The plaintiffs in Brown argued that the method of adopting a reorganization plan sanctioned by the Reorganization Act violated the State Constitution's mandate "that a bill shall not pass unless a majority of all the members present in each house shall agree thereto, [N.J. Const. art. IV § 4, ¶ 6], and the further mandate that the bill shall then be presented to the Governor for his consideration, [N.J. Const. art. V, § 1, ¶ 14]." Id. at 5, 297 A.2d 572. The plaintiffs also contended that the statute violated the separation-of-powers requirement of Article III, paragraph 1 by permitting the Governor to exercise legislative power. Ibid.
The Court noted that the Brown plaintiffs "do not say the delegation to the Governor of authority to adopt a reorganization plan is defective for lack of adequate standards for the exercise of the delegated power." Id. at 5-6, 297 A.2d 572. Indeed, the Court found the standards "plainly sufficient," id. at 6, 297 A.2d 572, noting that "[t]hey are found in [the Reorganization Act's] statement of the purposes to be achieved, N.J.S.A. 52:14C-2(a), and in the specification of what a reorganization plan may do, N.J.S.A. 52:14C-4(a), and may not do, N.J.S.A. 52:14C-6(a)." Ibid. Rather, the Court noted, the issues in Brown were whether the power to reorganize was nondelegable as power that must be exercised by the Legislature itself, and also whether the Legislature's reservation of the authority to disapprove a reorganization plan rendered invalid a delegation of power that otherwise would have been constitutionally permissible. Ibid.
The Court's analysis in Brown relied primarily upon the fact that the federal Executive Reorganization Act, 5 U.S.C.A. §§ 901 to 913, upon which the New Jersey law was modeled, had been upheld by the courts. Ibid. The Court noted that under the analogous federal statute, as it then existed, the President was "authorized to prepare plans for reorganizations within his branch of government, to become effective unless disapproved by either house of the Congress rather than by both houses as under the New Jersey statute...." Ibid. (citing 5 U.S.C.A. § 906(a)). The Court observed:

*634 With respect to the issue before us, the federal court said in [Isbrandtsen-Moller Co. v. United States, 14 F.Supp. 407, 412 (S.D.N.Y.1936), aff'd on other grounds, 300 U.S. 139, 57 S.Ct. 407, 81 L.Ed. 562 (1936)]:
"As it [the Congress] did not confer upon anyone functions it was bound to keep and exercise for itself, there was no failure to preserve the required separation of governmental powers."
.... The question has not since been raised. It is safe to say the constitutionality of the federal statute is now accepted.
[Id. at 6-7, 297 A.2d 572.]
The Court in Brown distinguished a New Hampshire case involving a similar statute because the New Hampshire Legislature had not intended to delegate the reorganization power to the Governor, whereas the New Jersey Legislature clearly did intend such a delegation. Id. at 7-8, 297 A.2d 572. The Brown Court also rejected the argument that the New Jersey Constitution was more restrictive than the United States Constitution regarding the definition of the legislative power and the intended separation of powers among the branches of government. Id. at 8-9, 297 A.2d 572. The Court concluded:
For present purposes, we think it enough to ask whether the statute so enhances the executive power as to threaten the security against aggregated power which the separation-of-powers doctrine was designed to provide. We must assume the Legislature found there is no such threat, and we must accept that evaluation unless it is plainly wrong. We cannot say it is. We note that the Governor is limited to rearranging what already exists. He is not empowered to decide what new or different authority should be vested in his branch of government.
....
It was for the Legislature to decide whether to delegate the power or to attempt itself to initiate plans of reorganization. The Legislature declared the purposes to be achieved by reorganization plans "may be accomplished in great measure by proceeding under this act, and can be accomplished more speedily thereby than by the enactment of specific legislation." N.J.S.A. 52:14C-2(b). There being authority to delegate the legislative power, it does not rest with us to quarrel with the legislative decision to make the delegation.
[Id. at 10, 297 A.2d 572.]
The present dispute implicates a different question: whether the Legislature intended to permit the abolition of an independent entity such as COAH by a reorganization plan upon which the Legislature never voted.
As we have noted, Brown rejected the argument that the New Jersey Constitution was more restrictive than the Federal Constitution regarding the definition of the legislative power and the intended separation of powers among the branches of government. Moreover, as stated above, Brown relied primarily upon the fact that courts had upheld the federal Executive Reorganization Act, upon which the New Jersey law was modeled. Id. at 6, 297 A.2d 572. Accordingly, analysis and consideration of this federal equivalent is useful, particularly because the amendments that became that act, and the legislative proceedings on those amendments, addressed issues of both the separation of powers and the application of reorganization authority to independent administrative agencies.
The House Committee on Government Operations, "Extension of Reorganization Authority of the President," H.R.Rep. No. *635 95-105 (1977), reprinted in 1977 U.S.C.C.A.N. 41, 41-70, elucidates the issues that were before Congress and its consideration of those issues. The Committee Chairman, Representative Brooks, noted that Congress had first broadly delegated reorganization authority to the President in 1949, but observed that the authority "ha[d] been dormant since early 1973." H.R.Rep. No. 105 at 9, reprinted in 1977 U.S.C.C.A.N. at 49. The House Report also outlined the purpose and history of the federal law. H.R.Rep. No. 105 at 1-9, reprinted in 1977 U.S.C.C.A.N. at 41-49. Chairman Brooks explained:
Every 2 or 3 years since 1949, Congress has had to decide whether the authority should be continued. It has never been an easy decision to make. It raises serious constitutional questions questions involving the separation of powers between the legislative and executive branches. It also raises practical questions about how much of its authority Congress should delegate to a President.
....
The tendency in recent years has been to put limitations on the authority in various ways. At times, Congress has been overly generous in giving some of our powers away, and we have had to take them back. For the last two years of his Administration, President Nixon didn't have reorganization authority at all, and President Ford never had it.
No President should assume that this authority is his automatically because other Presidents had it. And no Congress should automatically surrender this substantial legislative authority because other Congresses have done so.
....
I have tried, in my bill, to preserve all the authority past Presidents have had to reorganize the Government, but I have tried to keep it clearly within the constitutional confines of our legislative process. The Constitution, after all, says all legislative power shall be vested in Congress. If a plan cannot survive a vote in Congress, it simply should not become law.
[H.R.Rep. No. 105 at 10, reprinted in 1977 U.S.C.C.A.N. at 49-50.]
The hearing before Congress focused in part on conflicting provisions of proposed bills to amend the federal Executive Reorganization Act. One bill contained a "legislative veto" approach which, like the federal law had previously provided, allowed a reorganization plan to become law within a certain period after its transmittal unless during that period either legislative house passed a resolution disapproving the plan. H.R.Rep. No. 105 at 8-9, reprinted in 1977 U.S.C.C.A.N. at 48-49. This structure differs from New Jersey's, where only a concurrent resolution passed by both legislative houses can halt a reorganization plan. Brown, supra, 62 N.J. at 6, 297 A.2d 572.
In a letter to the President that was summarized in House Report 105, the United States Attorney General opined that the "legislative veto" approach in the federal act was constitutionally valid because it effectively preserved both the power of the veto and the important principle of bicameralism. H.R.Rep. No. 105 at 10-11, reprinted in 1977 U.S.C.C.A.N. at 50-51. In reference to bicameralism,[5] the Attorney General observed that it "is respected by the reorganization statute as no reorganization plan can take effect if opposed by either House. *636 Both Houses have equal power with respect to the congressional decision to accept or reject the reorganization plan." H.R.Rep. No. 105 at 11, reprinted in 1977 U.S.C.C.A.N. at 51. The Attorney General cautioned that his opinion as to the legislative veto's constitutionality was "limited to the narrow context of the reorganization statute," because that statute "does not affect the rights of citizens or subject them to any greater governmental authority than before. It deals only with the internal organization of the executive branch, a matter in which the President has a peculiar interest and special responsibility." H.R.Rep. No. 105 at 11, reprinted in 1977 U.S.C.C.A.N. at 51. For that reason, the Attorney General opined that the legislative veto was "uniquely appropriate" to that context. H.R.Rep. No. 105 at 11, reprinted in 1977 U.S.C.C.A.N. at 51.
Former Assistant Attorney General (now Associate Justice of the Supreme Court) Antonin Scalia disagreed with the Attorney General and said:
There is, I suggest, one incidental loser: the people who are entitled to have changes in the law positively considered and approved by their representatives not merely if the representatives wish to do so, but whether they wish to do so or not. The very impediments to prompt action which this legislation is designed to eliminate are the impediments which the Constitution prescribes to protect our citizens against the adoption of oppressive or ill-considered laws....
[H.R.Rep. No. 105 at 11-12, reprinted in 1977 U.S.C.C.A.N. at 52.]
In making this observation, then-Assistant Attorney General Scalia relied on a passage from The Federalist No. 62 (James Madison), describing equal State representation in the Senate as supplying "the additional impediment it must prove against improper acts of legislation[,]" which, as a "complicated check on legislation" could be both "injurious as well as beneficial" but nonetheless important because "the facility and excess of lawmaking seem to be the diseases to which our governments are most liable...." H.R.Rep. No. 105 at 12, reprinted in 1977 U.S.C.C.A.N. at 52. Consistent with these concerns, he concluded that the statute's legislative veto approach bypassed "the delay inherent in the bicameral legislative process; the lobbying pressure from groups proximately affected; [and] the political cost of casting a vote one way or another on controversial substantive issues[,]" all of which were "not incidental obstructions to the governmental process" but rather "an essential and indispensable part of our representative democracy. Their elimination is an abdication by the Congress of its constitutionally assigned responsibilities; and a usurpation, by the Congress and the Executive acting in concert, of a legislative power not accorded to them by the people." H.R.Rep. No. 105 at 12, reprinted in 1977 U.S.C.C.A.N. at 52.
Professor Phillip Kurland of the University of Chicago Law School and Professor Laurence Tribe of Harvard Law School joined Assistant Attorney General Scalia in expressing concern about the constitutionality of the legislative veto. H.R.Rep. No. 105 at 13-17, reprinted in 1977 U.S.C.C.A.N. at 53-56.
Consistent with the Scalia observations, Professor Tribe suggested, and the Committee adopted, changes to the proposed bill that addressed these constitutional concerns, H.R.Rep. No. 105 at 16, reprinted in 1977 U.S.C.C.A.N. at 56, including a provision that "no reorganization plan submitted under the statute's authority may transfer a function from an independent agency or commission to an agency or branch of an executive department." H.R.Rep. No. 105 at 16, reprinted in 1977 *637 U.S.C.C.A.N. at 56 (emphasis added). The proposal further recommended a structure whereby resolutions of disapproval be prepared whenever a reorganization plan was proposed, so that any Member of Congress could call for a vote on the matter, "virtually assur[ing] a vote by both the House and the Senate on every plan." H.R.Rep. No. 105 at 17, reprinted in 1977 U.S.C.C.A.N. at 57. Congress adopted these changes in the final bill, so that a reorganization plan could not include "abolishing or transferring an executive department or independent regulatory agency...." 5 U.S.C.A. § 905(a)(1).
In EEOC v. Ingersoll Johnson Steel Co., 583 F.Supp. 983, 990 (S.D.Ind.1984), the court reviewed this federal legislative history and described Professor Tribe as having "opined that the [original] bill would have to be `very substantially narrowed' by restrictions on the President's powers" to be constitutional under Article I of the United States Constitution. The court added: "[i]n fact, nearly all of Tribe's narrowing suggestions were incorporated, so that the statute as enacted proscribed Presidential changes in the substantive law to the maximum feasible extent." Ibid. "The law now forbids the President from abolishing any enforcement function, conferring any power not expressly authorized by statute, interfering with an independent regulatory agency, abolishing any program created by statute, or creating any new cabinet-level department." Ibid. (citing 5 U.S.C.A. §§ 903(a)(2) and 905(a)(1)). In addressing the constitutional challenge to the federal Executive Reorganization Act, the Ingersoll Johnson Steel court noted that the Supreme Court in Immigration & Naturalization Service v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), had held that a one-house legislative veto was unconstitutional. The court further observed:
"Not every action taken by either House is subject to the bicameralism and presentment requirements of Art. I. Whether actions taken by either House are, in law and fact, an exercise of legislative power depends not on their form but upon whether they contain matter which is properly to be regarded as legislative in character and effect." [Chadha, supra, 462 U.S. at 952,] 103 S.Ct. at 2784[, 77 L.Ed.2d at 345 (internal quotation marks and citations omitted)]. Any action legislative in character must be performed by passage in both houses and presentment to the President.
[Ingersoll Johnson Steel, supra, 583 F.Supp. at 985.]
In language that resonates with the present dispute, the Ingersoll Johnson Steel court observed that the President's power under the statutory delegation by Congress "is essentially organizational," because the President "cannot confer or abolish substantive powers, but can only realign agencies and their powers to promote efficiency, economy and better service." Id. at 990. Noting that "Congress addressed the issue of delegation in a manner that set sufficient restrictions on the delegation of power to the executive," the court concluded: "We cannot hold the delegation unconstitutional in the face of these limits." Ibid. The court acknowledged that one district court had already held that the federal Executive Reorganization Act was unconstitutional. Id. at 986. However, the court did not address the constitutionality of that act as it applied to the parties before it on account of: the special procedures added to it, the fact that the legislative veto was not exercised in the case presented, and the absence of adversarial presentation on the issue of constitutionality given both parties asserted its unconstitutionality. Id. at 986-87.
*638 A narrow interpretation of New Jersey's Reorganization Act is warranted here. In light of the considerations articulated in both Brown and Ingersoll Johnson Steel, we conclude that application of the Reorganization Act requires an explicit legislative mandate to warrant the abolition of an independent agency, rather than generic language, in order to subject such agencies to reorganization or, as here, to abolition.
As we noted at the outset, the legislation that created COAH was carefully crafted to address issues of constitutional dimension. The Legislature provided for the representation and participation of the primary constituents in the ongoing dispute about affordable housing. It sought to ensure public participation and input without reserving control or decisionmaking to one person or political party. And most importantly, the Legislature utilized language that it had used before, creating an agency that was "in but not of" a constitutionally mandated department and beyond the control and influence of unilateral action by the Governor. The Reorganization Act did not change the independent agency paradigm.
The issue in this case is not whether COAH should or should not be an active participant in developing and implementing policies for affordable housing in New Jersey. Recent events have demonstrated that both the Legislature and the Governor are committed to charting another course for the future of affordable housing in this State. By enacting Senate Bill No. 1, the Legislature expressed its intent to abolish COAH. However, as we previously noted, that legislation was vetoed, and the Governor's unilateral reorganization plan followed.
We conclude that the power to abolish COAH rests exclusively with the Legislature. The debates of the Constitutional Convention inform us that the issue of executive control of independent agencies was addressed by use of the simple but meaningful phrase "in but not of." While the framers of our Constitution intended to create a strong executive in the office of Governor (perhaps the strongest in the United States), they also recognized the need to insulate functions and agencies from executive control. The framers acknowledged the principle that the power to create and abolish such agencies and to alter such functions resided within the legislative process, involving both the Legislature and the Executive. We hold that, as an "in but not of" agency, COAH is not subject to the Reorganization Act. Accordingly, we conclude that Reorganization Plan 001-2011, abolishing COAH, is invalid.
Reversed.
NOTES
[1] This statute has been amended several times, the details of which are not directly relevant to the limited issue before us.
[2] We cite these differences to illuminate the nature of the independent agency's operation, which the Legislature envisioned when it created COAH as part of the FHA. We do so with a recognition that any reorganization creates changes in procedures and operations. The unique feature here, however, is that the Commissioner's changes effect a substantive difference that is relevant to the legislative intent in creating COAH within the FHA.
[3] The State contends, in a footnote, that "this is not the first time that a Governor has used the Reorganization Act to alter the status of an `in but not of' agency." While this is accurate, it fails to recognize the important distinction between that transfer and the "abolition" proposed here. The history of that transfer is critical. In 1995, the Legislature amended legislation regarding the New Jersey Historic Trust (Trust) to make the Trust "in but not of the Department of Environmental Protection[.]" N.J.S.A. 13:1B-15.111. In 1998, pursuant to Reorganization Plan No. 004-1998, Governor Christine Todd Whitman ordered that "[t]he New Jersey Historic Trust... and its functions, powers and duties ... and personnel are continued and transferred to the Department of State. The functions, powers and duties of the Commissioner of the Department of Environmental Protection with regard to the Trust shall be organized and implemented within the Department of State as determined by the Secretary of State." 30 N.J.R. 1351(a) (April 20, 1998) (emphasis added). This change appears to contrast with Governor Whitman's treatment of other "in but not of" agencies mentioned in the same plan. For example, in the subsequent section, Governor Whitman stated, "[t]he Office of Administrative Law ... [which is] in but not of the Department of State ... is constituted, in but not of, the Department of the Treasury." 30 N.J.R. 1351. However, the linguistic difference between the two provisions proved to have no substantive effect. Like the other "in but not of" agencies, the Trust was transferred to a different department within the executive branch but otherwise remained intact. In 1999, the Legislature enacted the Garden State Preservation Trust Act, L. 1999, c. 152, which established the successor to the Trust and described that successor as an agency "in but not of the Department of the Treasury ... [,] to be known as the `Garden State Preservation Trust.' ... [N]otwithstanding that allocation, the trust shall be independent of any supervision or control...." The legislative history indicates that the Legislature ratified Governor Whitman's plan as "the transfer ... of the [Trust] from in but not of the [Department of Environmental Protection] to in but not of the Department of State...." S.R., 208th Leg., No. 9, at 60:38-42 (N.J. 1999). The circumstances under which the Trust was relocated indicate that Governor Whitman did not in fact use the Reorganization Act to abolish the Trust's status as an "in but not of" agency.
[4] The FHA itself demonstrates the legislative distinction between independent and non-independent agencies and programs. See, e.g., N.J.S.A. 52:27D-320 ("There is established in the Department of Community Affairs, a separate trust fund, ... which shall be known as `The New Jersey Affordable Housing Trust Fund' ....") (emphasis added); N.J.S.A. 52:27D-329.7 ("There is established within the Department of Community Affairs an Urban Housing Assistance Program....").
[5] The Attorney General described bicameralism as follows: "that each House of Congress has the right that there be no change in the law without its consent." H.R.Rep. No. 105 at 11, reprinted in 1977 U.S.C.C.A.N. at 51.